## DENT *v.* FERGUSON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TENNESSEE.

No. 32. Argued April 23, 24, 1889. — Decided October 28, 1889.

The petition of a bankrupt in bankruptcy, in which he states under oath that he owns no real estate and holds no interest in real property, is evidence of the execution and validity of a prior deed of his real estate in a suit in which he contests such execution and validity.

The proof in this case fails to show imbecility, dotage or loss of mental capacity on the part of the appellee at the time when the contract in dispute was made.

An executed agreement by one party to cause the debts of the other to be cancelled by his creditors, valid in its inception, is not invalidated as to the debtor by reason of the settlements being effected for a small percentage, or even by the employment of improper means to effect them.

A conveyance by a debtor, deeply indebted, and in anticipation of decrees and judgments which, added to existing incumbrances, will amount to the value of the property conveyed, will lead a court of equity to presume that the instrument was executed in fraud of the creditors.

If a person conveys his property for the purpose of hindering, delaying or defrauding his creditors, and for many years acquiesces and concurs in devices, collusive suits and impositions upon the court in furtherance of that purpose, without taking any step to annul such conveyance or stop such proceedings, a court of equity will not aid him or his heirs to recover the property from the grantee or his heirs after the fraud is accomplished.

The maxim "*in pari delicto, potior est conditio defendentis*" is decisive of this case.

THIS was a suit in equity originally brought in the Chancery Court of Shelby County, Tennessee, on the 10th of December,

1881, by the appellees, heirs-at-law of Alexander M. Ferguson, deceased, against the appellants, heirs-at-law and legal representatives of Henry G. Dent, deceased. Upon application of the complainants, the case was removed into the United States Circuit Court for the Western District of Tennessee on the ground of the diverse citizenship of the parties.

The object of the original and the two amended and supplemental bills was to recover from the defendants a large amount of real property alleged to have belonged to A. M. Ferguson, deceased, and to have been fraudulently obtained from him by Henry G. Dent, deceased; and also to have set aside and annulled the agreement, deeds and judicial proceedings by which such fraudulent acquisition was effected.

The instrument which the complainants most especially sought to have delivered up and cancelled purported to be an absolute agreement and conveyance of a large amount of real property situated in Memphis, Tennessee, executed by Ferguson to Dent, and was as follows:

"This agreement, made this 14th day of May, 1869, by and between A. M. Ferguson, of the first part, and H. G. Dent, of the second part, all of the city of Memphis and State of Tennessee, witnesseth, that the said Ferguson, for the purposes and considerations hereinafter set forth, has this day bargained and sold to the said Dent all his right, title and interest of, in and to certain lots or parcels of land situated, lying and being in the city of Memphis and State of Tennessee, as per schedule thereof hereto annexed, and for identification signed by the parties hereto.

"That for said considerations he binds himself to make conveyance by quit-claim to said Dent, or to whomsoever he may direct, of said several pieces of property on demand, excepting, however, one piece of property contained in the schedule hereto annexed, situated on the southeast corner of Beale and Hernando streets, to which he agrees to make a warranty deed to James E. Dillard, to whom said Dent has bargained the same for $8000 subject to certain judgment liens which will be expressed on the face of said deed when it shall be executed. The

consideration of this agreement is that the property hereby agreed to be conveyed is much encumbered by judgments, decrees and deeds of trust, taxes and assessments for grading and paving to nearly, if not quite, its full value, as also shown in said schedule, and the only interest remaining to said Ferguson in the same is his equity of redemption. For this equity he is willing to take the sum of $10,000, and allow the purchaser to make the best use he can of the property in paying off said encumbrances and making what he can out of the surplus. The further consideration of this agreement is, therefore, that the said H. G. Dent will pay the said A. M. Ferguson the sum of $4000 in cash in hand and by the conveyance to be made to James E. Dillard, will secure the payment of the further sum of $6000 to said Ferguson, making an aggregate of $10,000 as agreed upon, and will dispose of the balance of said property to the best advantage, to discharge the liens thereon, or otherwise discharge the same, and will have no recourse on said Ferguson in law or equity for any encumbrance or defect of title whatsoever on any of said pieces or parcels of land, but take the same at his own risk; and inasmuch as the terms, conditions and considerations of this agreement cannot be properly expressed in the several conveyances desired and contemplated by the parties, this instrument and the schedule hereto annexed are made for a more thorough and complete explanation and exposition of the same.

" In testimony whereof the said A. M. Ferguson and H. G. Dent have hereunto set their hands the day and date first above written.

" Attest: W. L. VAN DYKE.    A. M. FERGUSON. [Seal.]
         C. W. FRAZER.    H. G. DENT.    [Seal.]"

The complainants averred in their bills that this instrument was drawn up and signed only as a plan proposed, but never adopted, was never understood by the parties to it to be of any force as between themselves, and was never in fact delivered to Dent, but was retained by Ferguson as his private property and placed with his other papers in the possession

and custody of his attornèy, one W. L. Van Dyke, where it remained until the death of the latter, when Dent, by fraudulent representations to a woman in charge of Van Dyke's room and effects, succeeded in abstracting it from the papers of Ferguson; and that Dent then, after Ferguson died, set up a claim to the ownership of the property under said pretended contract. They further averred that, even if said instrument was really delivered, it was void because of the fraudulent means and undue influence by which Dent imposed upon Ferguson to make a conveyance of his property at a grossly inadequate price, which was never paid. It was further alleged that Dent was, at the date of said agreement, and had been for many years prior thereto, the agent of Ferguson in the management of his property, and had so gained his confidence and had acquired such an ascendancy over Ferguson's mind and will, especially during the latter part of his life, when he was in his dotage and incapacitated to attend to his interests, that all his financial transactions were subject to Dent's supervision and direction; that among these transactions was an indorsement by Ferguson on the 12th of April, 1867, of four notes of Dent of $12,500 each, aggregating in amount $50,000, which he (Dent) gave in part payment of a purchase by him of a stock of goods from Lockwood & Co. in Memphis; that this sale by Lockwood & Co. to Dent was soon afterwards attacked by the creditors of the former as fraudulent, and four successive attachments were sued out and levied upon the stock of goods; and that four replevin bonds were given by Dent and signèd by Ferguson, one as surety and the other three as a principal, he having purchased from Dent one-half interest in the stock.

It was alleged that the amount of the judgment rendered on these bonds against Dent and Ferguson was about $65,000; and that of the Lockwood notes for $50,000, one was claimed to have been paid off and taken up by Dent, the other three having been compromised by Dent and Ferguson giving their notes for $18,000, secured by a deed of trust upon a large part of the Ferguson property in dispute and one lot belonging to Dent, executed to one Carmack, trustee for certain

creditors into whose hands the notes had fallen. It was further alleged that Ferguson, harassed by this sudden and largely increased indebtedness, (already great,) desired and proposed to make an assignment for the benefit of his creditors, but was overruled in this purpose by the controlling influence of Dent, who, by imposition and fraud, prevailed upon him to sign the pretended contract of May 14, 1869, which the said Dent got up to serve his purpose of fraudulently possessing himself of Ferguson's estate.

The bill further set forth with great minuteness of detail the various subterfuges and contrivances to which, it was alleged, Dent resorted to cover up and conceal from the creditors the ownership of the property, and the trust deeds and judicial proceedings by which the baffled creditors were inveigled into compromises at enormous sacrifices ; and that various persons, mostly Dent's attorneys and relations, or persons having an understanding with him, purchased all of the property under these trust deeds and at said judicial sales, (with money furnished by Dent, which he raised from the rents and profits of Ferguson's estate,) and held their titles in trust for said Dent.

It was then alleged that all the liabilities of Ferguson had been settled, and all the encumbrances upon his property removed, for the most part, out of the rents and profits of said property.

The prayer of the bill was that the contract of May 14, 1869, be declared void ; and that the defendants be declared trustees of the property for the complainants, and required to turn it over to their possession, and account for its rents and profits.

The answer, after a general denial of all the allegations of the bill, especially denied those relating to the undue influence charged to have been exercised by Dent over Ferguson, those relating to Dent's agency, and those relating to Ferguson's dotage, weakness of mind and incapacity for business. It admitted that Dent's heirs had in their possession a deed or contract properly executed, attested and delivered, dated May 14, 1869, but unregistered, under which they claimed title to the property referred to in the bill, and averred the fairness and justice of the contract, its delivery to Dent by Ferguson, and

also the delivery into his actual possession of all the property conveyed by it. It also set forth the hopeless condition of Ferguson's affairs; that Dent had extinguished the debts and removed from the property all the encumbrances and paid the $10,000, or its equivalent, which was the consideration mentioned in the deed; and that $10,000 and the discharge of the debts, quite as great in amount as that of the value of the property conveyed, constituted a full and sufficient price therefor. It set up as a defence the acquiescence of Ferguson, as long as he lived, (a period of eleven years,) in the contract, and in Dent's acts under it, and also the fact that Ferguson had filed his petition in bankruptcy, stating under oath that he did not own any real estate, which proceeding it relied on as an estoppel and as proof of an outstanding title.

The defendants Frazer, Trezevant and the De Soto Building and Loan Association each filed a separate answer, in which they each stated that the titles held by them respectively to the property with which the bill had connected their names were held by them as trustees for Dent, or as a security for fees, advances and loans to him. Dillard, in his deposition, answered, alleging that the titles held by him to any of the property claimed by complainants were held for the benefit of Dent. Hooper and wife answered, denying the averments of the bill that Susan R. Hooper purchased the Selby claim which she was prosecuting against the estate of Ferguson, as the agent of Dent, but averring that such purchase by her was *bona fide* and for her own use and benefit, and that said claim was then her own property.

The answers of the other defendants averred that before the filing of the bill they had parted with whatever right or title they ever had to any of the property in controversy.

Proofs were taken and a hearing was had before the circuit justice, the district judge sitting with him, and a decree was rendered in accordance with the prayer of the bill. 24 Fed. Rep. 412.

*Mr. D. H. Poston* and *Mr. T. B. Turley*, for appellants, cited: *Battle* v. *Street*, 85 Tennessee, 282; *Taylor* v. *Harwell*,

5 Humphreys, 331; *Searcy* v. *Carter*, 4 Sneed, 271; *Magniac* v. *Thompson*, 7 Pet. 348; *Walker* v. *McConnico*, 10 Yerger, 228; *Jenkins* v. *Pye*, 12 Pet. 241; *Heyward* v. *Elliot Nat'l Bank*, 96 U. S. 611, 617, 619; *Graham* v. *Boston, Hartford &c. Railroad*, 118 U. S. 161; *New Albany* v. *Burke*, 11 Wall. 96; *Preston* v. *Preston*, 95 U. S. 200; *Bolton* v. *Dickens*, 4 Lea, 569; *Burke* v. *Smith*, 16 Wall. 390, 401; *Snell* v. *Atlantic Ins. Co.*, 98 U. S. 85; *Grymes* v. *Sanders*, 93 U. S. 55; *Sullivan* v. *Portland & Kennebec Railroad*, 94 U. S. 806; *Brown* v. *Buena Vista County*, 95 U. S. 157; *Hamilton* v. *Zimmerman*, 5 Sneed, 39, 48; *Cooley* v. *Steele*, 2 Head, 605; *Stephenson* v. *Walker*, 8 Baxter, 289; *Bank* v. *Sherman*, 101 U. S. 403; *Conner* v. *Long*, 104 U. S. 228; *Glenny* v. *Langdon*, 98 U. S. 20; *Redmand* v. *Gould*, 7 Blackford, 361; *Griswold* v. *McMillan*, 11 Illinois, 590; *Berry* v. *Gillis*, 17 New Hampshire, 9; *S. C.* 43 Am. Dec. 584; *Lea* v. *Talfer*, 1 Car. & P. 147; *Mims* v. *Swartz*, 37 Texas, 13; *Swepson* v. *Rouse*, 65 N. C. 34; *Crayton* v. *Hamilton*, 37 Texas, 269; *Fay* v. *Reager*, 2 Sneed, 203; *Killibrew* v. *Murphy*, 3 Heisk. 546; *Johnson* v. *Geisriter*, 26 Arkansas, 44; *Barron* v. *Newberry*, 1 Bissell, 149; *Perley* v. *Dole*, 38 Maine, 558; *Oakey* v. *Corry*, 10 La. Ann. 502.

*Mr. T. B. Edgington*, for appellee, cited: *Jackson* v. *Leek*, 12 Wend. 105; *Fay* v. *Richardson*, 7 Pick. 91; *Hampton* v. *Rouse*, 22 Wall. 263; *Sutherland* v. *Davis*, 42 Indiana, 26; *Hamilton* v. *Zimmerman*, 5 Sneed, 39; *Helm* v. *Wright*, 2 Humphreys, 72, and Cooper's notes; *Decherd* v. *Blanton*, 3 Sneed, 373; *Smith* v. *Fowler*, 12 Lea, 163, 174; *Lincoln* v. *Purcell*, 2 Head, 143, 145; *S. C.* 73 Am. Dec. 196; *Faucher* v. *DeMontegre*, 1 Head, 40, 41; *Hurd* v. *French*, 2 Tenn. Ch. 355; *Meriwether* v. *Vaulx*, 5 Sneed, 300; *Kirk* v. *Smith*, 9 Wheat. 241, 256; *DeArusmont* v. *DeLagerty*, 9 Lea, 199; *Armstrong* v. *Campbell*, 3 Yerg. 201; *S. C.* 24 Am. Dec. 556; *Bovey* v. *Smith*, 1 Vern. 60; *Johnson* v. *Waters*, 111 U. S. 640; *United States* v. *Throckmorton*, 98 U. S. 61, 65, 66; *Brooks* v. *Cauhgran*, 3 Head, 464; *Williamson* v. *Godwyn*, 9 Grattan, 503; *Pettus* v. *Smith*, 4 Rich. S. C. Eq. 197; *Wiley* v. *Knight*, 7 Alabama, 336.

MR. JUSTICE LAMAR, after stating the facts in the foregoing language, delivered the opinion of the court.

The main grounds of the bill are :

(1) That the agreement or conveyance of May 14, 1869, was never delivered, but was only a paper in contemplation to be executed, and that the execution and delivery of it were finally abandoned ; and

(2) That said contract was procured by fraud on the part of Dent to enable him to possess himself of the estate of Ferguson without paying him a valuable consideration therefor; and that Ferguson was of weak mind, in his dotage, and easily imposed upon by Dent, between whom and himself the relation of principal and agent existed.

We concur fully in the position assumed by both the circuit justice and the district judge, that the execution and delivery of the agreement and conveyance of May 14, 1869, by Ferguson to Dent were sufficiently proven. A careful examination of the evidence, especially that introduced in behalf of complainants, leaves no doubt on this point. The paper was frequently recognized and acted upon by Ferguson. He received part, at least, of the money to be paid under it and frequently called for more, complaining of Dent that he had not fully paid the amount agreed to in the contract. He received the two Dillard notes for $3000 each, as provided for in it, in part payment, and also accepted Dillard's deed of trust on the property conveyed to him, as securities therefor. He solemnly reaffirmed it over his own signature and seal on the 23d of August, 1869, in a deed introduced in evidence by complainants, in which deed the recital is as follows : " Whereas on the 14th of May, 1869, H. G. Dent and A. M. Ferguson entered into an agreement of purchase and sale, by which said Dent purchased the equity of said Ferguson in all his real estate in Shelby County for the sum of $10,000, $4000 of which was to be paid in cash, and $6000 in notes," etc. He again recognized and carried out his part of it, when, on the 25th of May, 1869, he made a deed to Dillard in pursuance of its terms. His petition in bankruptcy, filed on April 29, 1878, in which he stated on oath

that he did not own any real estate, nor hold any interest in any real property, except a leasehold that would expire in less than a month, though not a technical estoppel as a defence in this suit, is at least evidence of the execution and validity of the instrument in question. In view of these facts, which appear from the proofs and pleadings of the complainants, we do not deem it necessary to review the mass of testimony offered by the complainants to sustain their charge that Dent purloined the writing from Ferguson's papers.

As to the second point we cannot assent to the conclusions of the court below. The evidence, we think, fails to show any imbecility, dotage or loss of mental capacity on the part of Ferguson in 1869, when the contract was made. About fifteen witnesses produced by the complainants were questioned as to the character and condition of his mind, three, and perhaps four, of whom, speak of him as being weak, ignorant and childish; but the general tenor of the testimony of the others, who had any opinions to express, was directly the reverse. The combined effect of this testimony, taken as a whole, putting out of view the evidence on behalf of the defendants, leaves on the mind a decided impression that Ferguson, though to a certain extent illiterate, was a man of good, sound sense, of large experience in business and capable of transacting his own affairs. Outside of the nature of the transaction itself, and the relation of principal and agent between him and Dent, which will be presently considered, there is very little, if any, testimony that he was ignorant of his rights or of the value of his property, or in the slightest degree incompetent to comprehend the terms of the contract in question, or to understand the obligations of an oath. Nor does a single witness testify that Dent ever falsely represented to Ferguson the amount of his indebtedness, ever under-estimated to him the value of his property, or ever exaggerated to him the danger from creditors. Even as to who suggested the contract of May 14, 1869, the testimony, slight as it is, is conflicting and uncertain.

It is, however, insisted that the price agreed to on the face of the instrument itself was so grossly inadequate as to create the presumption of fraud and undue influence, aside from, and

independent of, any proof other than the single fact that the parties thereto bore the relation to each other of principal and agent. Assuming for the present, and for present purposes only, that the agreement was *bona fide* as respects third persons, creditors of Ferguson and Dent, and considering it with exclusive reference to the reciprocal rights of the two parties to it, we do not think the evidence is such as to raise the presumption of fraud and therefore to call for or justify the interposition of a court of equity for the cancellation of the contract. The fairness of the transaction, on this point, should be determined by the condition of things at the time the contract was made and executed, and not by what occurred afterwards, except so far as subsequent developments may reflect light upon it.

What were the circumstances under which this instrument was executed? A. M. Ferguson was then possessed of a large estate in Memphis, consisting of valuable city lots with improvements, all estimated by competent witnesses to be worth $100,000, more or less. At that time he was indebted to various persons in sums which, we believe, it is admitted amounted to as much as the value of his property. Many of these debts, perhaps the majority in amount, originated as joint promissor with, or as indorser or surety for, Henry G. Dent, who had been his agent for the renting of his property and intimate friend for many years, and who was himself wholly insolvent. But whatever the origin of his debts, they had become, as between Ferguson and his creditors, legal and binding upon him; nor did the fact that they were the liabilities of an indorser lighten the burden of them, or lessen the peril of impending insolvency, or abate the eagerness of pursuing creditors. These creditors had been for some time active and pressing for payment, and his real estate was heavily encumbered with judgments, decrees, deeds of trust, sheriff's deeds, taxes and assessments for public improvements. Several other suits, aggregating nearly $50,000, were proceeding to judgment. Some idea of his embarrassed condition may be found from the fact that on the 29th of March, 1869, a bill had been filed to reach his equitable rights and interest in the

property, the subject of this controversy, in which the complainant alleged on oath that an execution issued on a judgment at law obtained by him against Ferguson had been duly returned "no property found whereon to levy;" and that after diligent search and inquiry he could not find any property in Memphis to which Ferguson had an unencumbered legal title subject to an execution at law.

Such was the condition of Ferguson's affairs when he made the agreement of May 14, 1869. The consideration of this agreement was that Ferguson should receive $4000 in cash and $6000 in notes, and that Dent should "*discharge the liens,*" not that he should *pay them in full.* This discharge Dent fully procured. Ferguson was fully discharged, and all claims against him were legally cancelled, not only those then existing, but also those that were impending and which afterwards matured. This fact is thus stated in the words of complainants' bill: "The liabilities of the said A. M. Ferguson by judgments, trust deeds, mortgages and mortgages in the form of warranty deeds, have all been settled and paid off except as hereinafter stated, and the said complainants, as heirs at law of the said A. M. Ferguson, are entitled to have the said real property handed over to them free and discharged of all liens."

If the promise to cancel the debts was a fair and valid transaction when it was made, it did not become less so because subsequent occurrences enabled Dent to effect a settlement with the creditors upon the payment of a small percentage of their respective claims; and if the means he employed to effect such compromises were not proper, it might give the overreached creditors cause of complaint, but certainly not Ferguson. Had Dent been able to persuade the creditors to give a release of their claims without any consideration whatever, that could not retroact and make inadequate what was an adequate consideration when the contract was made. When it was made no one knew that the debts could be compromised for much less than their face value as was done by Dent; for as the district judge truly remarks: "The astounding fact in this record is that the creditors did not appropriate

all this property to their debts." And yet it is an undeniable fact that Dent did avert such an appropriation; and that Ferguson was fully discharged, and the claims were legally cancelled by methods not fully developed, but assented to and facilitated by Ferguson. For instance, a judgment for over $22,000 in favor of H. B. Claflin & Co. of New York, was settled for $1000; a claim in favor of Louis Selby for $12,-622.11 for $1325; and an assessment for $6998 for the Nicholson pavement, stated in said agreement of May 14, 1869, to be a lien on the property conveyed, was entirely defeated on legal grounds.

The consideration as to the extinguishment of the debts was fully performed. The $6000 of notes were received by Ferguson and afterwards indorsed to his relatives. As to how much of the remaining $4000 coming to him under the agreement was paid to him in cash, there is much conflict of testimony, which, owing to the lapse of time and the death of both parties to the contract, cannot be reconciled. Apparently $1400 was paid soon after; for the instrument dated August 23, 1869, which the complainants introduced and rely on, states that the payment of that sum was made on that day. C. L. Morrison, a witness for complainants, whose testimony their counsel declares, in his brief, to be more important than that of any and all the other witnesses for complainants, testifies that from 1871 to 1876 he paid to Ferguson from $80 to $90 a month out of the rents collected by him from a portion of the property; and that he saw Dent pay him during that period out of his own pocket about $300 a year. These sums aggregate a larger amount than $4000.

Our conclusion, therefore, is that the contract, considered apart from its bearing on other creditors, does not in the absence of other proof lack the essential qualities of adequacy and fairness as between the parties thereto themselves. If this be so, the point as to principal and agent, upon which so much stress has been laid, is of minor importance. The doctrine as to this fiduciary relation, applied to its full extent, is simply a rule of evidence which, under some circumstances, imposes upon an agent the burden of proving the fairness and justice

of the transaction with his principal within the scope of his agency. If the contract was valid as to the creditors of Ferguson, the consideration therein expressed was sufficient to satisfy this burden.

The evidence shows that for many years Dent was an agent of Ferguson for the renting of his property, with more intimate relations than with his other patrons. But the record does not show that he was ever employed to buy or sell real estate for Ferguson. On the contrary, there is positive testimony that his (Ferguson's) traffic in that business was carried on by himself alone.

We have considered this case, so far, upon the assumption of the circuit justice, that the agreement was executed and delivered by Ferguson to Dent in good faith as to Ferguson's creditors. We do not concur in this assumption. If the voluminous record before us discloses a single fact tending to sustain that assumption, except a general expression of opinion by some of the witnesses that he was an honest man, it has escaped our search. The instrument itself was executed under circumstances which would lead a court to presume fraud upon creditors. It was a conveyance by a person deeply indebted, in anticipation of decrees and judgments, which, added to the existing encumbrances, amounted to the value of his property. We, therefore, agree with the district judge on this point, that the real contract was one between Ferguson and Dent to defraud the creditors out of the property conveyed, and to so conceal and cloud the title that they could be circumvented, hindered and delayed, and coerced into settlements and compromises. We think the evidence shows beyond doubt that Ferguson willingly participated for ten years in carrying out this plot. Both parties knew that $10,000 could not be saved for Ferguson, or any residuum out of the property for Dent, unless creditors could be wrought upon by some means to accept less than their claims. Neither party to such a contract could have been deceived or imposed upon about that result. Both knew the record fact, that the encumbrances perfected, and the encumbrances rapidly perfecting, exceeded in amount the value of the property.

That Ferguson had that fraudulent design when he signed his name to the instrument and turned over the property to Dent, as its owner, was directly sworn to by witnesses introduced by the complainants and examined by them — of course for a very different purpose. Mrs. A. G. Morrison, a witness produced to show that Dent had fraudulently abstracted certain papers from Ferguson deemed by him to be important and valuable, deposes as follows in reply to the question "What was it Mr. Ferguson told you about the sale of the property?" [referring to the sale now under consideration]: "He told me he went on Mr. Dent's bond, as near as I can remember. Mr. Dent went into business and broke, and the property was covered up some way in Mr. Dent's name to keep it from being sold. I couldn't tell you how long Mr. Ferguson told me, but I am positive he told me it was covered up in Dent's name, and he says: 'There is wherein Dent has robbed me; he would not give me those papers back.'" In reply to another question, which the witness said did not repeat her previous answer accurately, she replied: "He didn't say it in those words. . . . He says he turned the property over to Dent, put it in his name," etc. Again, "He said something about a receiver being appointed, and he says: 'I turned the property over to Dent to keep it from being sold; I don't want it sold, because the rent of my property will pay the debt,'" etc. Another witness for the complainants, Robert McWilliams, testifies as follows concerning a conversation had with Ferguson in 1878: "If I remember correctly, he said that he had made over his property to Dent, with the tacit understanding that he should have sufficient to live on until his discharge in bankruptcy, and then Dent would return or turn over the property to him again." In reply to the question "What, if anything, do you know concerning the arrangement of A. M. Ferguson and Henry G. Dent concerning the Ferguson property on Beale, Hernando and De Soto streets and elsewhere?" he said: "I know of nothing except that Ferguson told me that he had conveyed this property to Dent with the tacit understanding that he (Ferguson) should have enough out of the rents of the property

to live on until he had got through bankruptcy, when the property should be returned to him again."

The question arises — if a person conveys his property for the purpose of hindering, delaying or defrauding his creditors, and for eleven years acquiesces and concurs in the devices, collusive suits and impositions upon the court in furtherance of this purpose, without taking a single legal step to annul said conveyance or to stop such proceedings, will a court of equity aid him or his heirs to recover the property from the grantee or his heirs after the fraud is accomplished? This court has answered that question in the negative in *Randall* v. *Howard*, 2 Black, 585. In that case the complainants and defendant had made an agreement to defeat the claims of third persons to certain lands which the complainants had mortgaged to the defendant to secure a debt, so as to cloak the ownership by means of a foreclosure sale at which the defendant should purchase and hold the nominal title. After obtaining the title, he fraudulently dispossessed the complainants and asserted the right of ownership in himself. The prayer of the bill was to restrain the defendant from disposing of the land, and to restore it, or so much of it as remained after paying the debt, to complainants. The court, Mr. Justice Davis delivering the opinion, held that the agreement was a fraudulent one, to defeat a claim set up by other parties for a portion of the mortgaged lands by the covering up, through the aid of the court, the real ownership of the property, and said (p. 588): "A fraudulent agreement was entered into to defeat, as is charged, 'a fraud attempted against the complainants.' . . . A court of equity will not intervene to give relief to either party from the consequences of such an agreement. The maxim, *in pari delicto potior est conditio defendentis*, must prevail. It is against the policy of the law to enable either party, in controversies between themselves, to enforce an agreement in fraud of the law, or which was made to injure another;" citing 1 *Story's Equity*, § 298; *Bolt* v. *Rogers*, 3 Paige, 154, 156; and *Wilson* v. *Watts*, 9 Gill, 356.

The same principle was applied in *Wheeler* v. *Sage*, 1 Wall.

518. In that case an agreement was entered into between complainants and defendant to secure the title to valuable real estate of an insolvent debtor, at the expense and sacrifice of his creditors, which the defendant violated, and, in conjunction with another person, secured an interest in the property to himself. The bill prayed that he be declared a trustee for the complainants, and required to convey to them that portion of the land to which, under the agreement, they were entitled. The court, Mr. Justice Davis delivering the opinion, said (p. 529): ".Generally, when a party obtains an advantage by fraud, he is to.be regarded as the trustee of the party defrauded, and compelled to account. But, if a party seeks relief in equity, he must be able to show that on his part there has been honesty and fair dealing. If he has been engaged in an illegal business and been cheated, equity will not help him." And then, after a review of the evidence in that case, the opinion concluded in these words: " A proceeding like this is against good conscience and good morals, and cannot receive the sanction of a court of equity. The principle is too plain to need a citation of authorities to confirm it. It is against the policy of the law to help either party in such controversies. The maxim, '*in pari delicto*,' etc., must prevail" (p. 530).

We cannot assent to the opinion of the district judge that this.maxim has no application to the case at bar. In the views prepared by him at the request of Mr. Justice Matthews, and which were adopted by the latter, he says, in speaking of the contract of May 14, 1869, that it is only "in *form* a contract for the sale of property;" and proceeds: "The real contract was one to defraud the creditors of Ferguson and Dent out of this property, and it was calculated that this could be done on a basis of $10,000 to Ferguson, to be realized out of the property itself, and all the balance to Dent, whatever that might be. But this was an unequal, unconscionable, and unfair division, particularly in view of actual results, in the accomplishment of which Dent has risked nothing but his time and labor. Ferguson has agreed to give too much for Dent's services in that behalf. .  .  .

One of the objects of the bill is to prevent the defendants from reaping the lion's share of the benefits of this confessed fraud, and the maxim, *in pari delicto potior est conditio defendentis*, . . . has no application whatever to a case like this."

From this view we dissent. We find no authority for the idea that it is the province of a court of equity to make a fraudulent debtor the special object of its favor because he has not received a large enough consideration for his "confessed fraud." That court is not a divider of the inheritance of iniquity between the respective heirs of two confederates in fraud. Mr. Justice Baldwin, delivering the opinion of the court, in *Bartle* v. *Coleman*, 4 Pet. 184, 189, uses the following language: "The law leaves the parties to such a contract as it found them. If either has sustained a loss by the bad faith of a *particeps criminis*, it is but a just infliction for premeditated and deeply practised fraud; which, when detected, deprives him of anticipated profits, or subjects him to unexpected losses. He must not expect that a judicial tribunal will degrade itself by an exertion of its powers, by shifting the loss from the one to the other; or to equalize the benefits or burthens which may have resulted by the violation of every principle of morals and of laws." Or, as Chancellor Walworth states it: "Wherever two or more persons are engaged in a fraudulent transaction to injure another, neither law nor equity will interfere to relieve either of those persons, as against the other, from the consequences of their own misconduct." *Bolt* v. *Rogers*, 3 Paige, 154, 157.

The cases relied upon by the court below to sustain its position do not shake the authorities we have cited to show that courts of equity refuse to annul and also to enforce contracts in fraud of the rights of others, when called to act as between the parties. For there is a distinct class of decisions affecting subsequent and collateral contracts not partaking of the fraud which infects the main transaction.

The principles established by those decisions in diversified forms, according to the varying cases, is that a new contract, founded on a new and independent consideration, although in

relation to property respecting which there had been unlawful or fraudulent transactions between the parties will be dealt with by the courts on its own merits.  If the new contract be fair and lawful, and the new consideration be valid and adequate, it will be enforced.  If, however, it be unfair or fraudulent, or the new consideration so inadequate as to import fraud, imposition or undue influence, it will be rescinded and justice done to the parties.  *Armstrong* v. *Toler*, 11 Wheat. 258; *McBlair* v. *Gibbes*, 17 How. 232; *Brooks* v. *Martin*, 2 Wall. 70; *Planter's Bank* v. *Union Bank*, 16 Wall. 483; *Railroad Co.* v. *Durant*, 95 U. S. 576.

But in all of those cases the court was careful to distinguish and sever the new contract from the original illegal contract. Whether in the application of this principle some of them do not trench upon the line which separates the cases of contracts invalid in consequence of their illegality from new and subsequent contracts arising out of the accomplishment of the illegal object, is not the subject of inquiry here.  The present case does not involve any question of a subsequent and distinct contract, but seeks relief directly from the original fraud, to which the person under whom complainants claim was a contracting party fully sharing in the fraudulent intent.

We do not think that complainants' counsel gives an explanation of the testimony of McWilliams which strengthens their claim to relief.  That claim, stated in his own language, is: " That Ferguson placed his property in Dent's hands, to be used in liquidating his debts, and, when this was done, the property, or so much of it as had not been consumed in the payment of debts, was to be restored to Ferguson, and that in the meantime Ferguson was to have enough of the rents to live on."

Such an arrangement, so entirely inconsistent with the absolute conveyance of the property as executed between the parties, has all the features of a fraud upon creditors.  It reserves to the grantor the enjoyment of the rents and profits of the property conveyed, to which the creditors have a right of immediate appropriation to their debts, and involves a secret trust for the return to himself of property of which such cred-

itors have the immediate right of sale. The law does not countenance any such transaction, but leaves both parties in the position where they have placed themselves. *Lukins* v. *Aird,* 6 Wall. 78.

' The district judge is mistaken when he says that " one of the objects of the bill is to prevent the defendants from reaping the lion's share of the benefits of this confessed fraud." The object of the suit, as clearly and explicitly stated in the bill, is to secure to the complainants the entire benefit of the confessed fraud by having all the property, with all the intermediate rents and profits added, free from all liens and liabilities, returned to them. The real complaint is that Dent, the fraudulent vendee, refused to perform his part of the fraudulent understanding with Ferguson, the fraudulent vendor; and the avowed purpose of the suit is to compel the defendants to perform it. The prayer cannot be granted without overturning established principles of equity.

The decree of the Circuit Court should, therefore, be

*Reversed, and the case remanded to that court, with a direction to dismiss the bill with costs ; so ordered.*