## Commonwealth v. Baroni et al.

*H. Vance Cottom*, district attorney, *Edward D. Brown* and *Wade K. Newell*, for the Commonwealth.

*Chad L. John*, for defendant Baroni.

*Thomas H. Hudson*, for defendant Frost.

CARR, J., August 21, 1945. (DUMBAULD, P. J., dissenting, August 23, 1945).—These are motions for a new trial and in arrest of judgment. Theodore Baroni and Ruth J. Frost, defendants, were tried and convicted upon an indictment charging them with conspiracy to withhold, convert, and apply to their own

use certain moneys alleged to have belonged to William H. Smart, the prosecutor. The motions raise questions of the sufficiency of the evidence to support the charge as a matter of law.

On the part of the Commonwealth the evidence was, in substance, as follows: On May 29, 1932, Smart, being the owner of eight contiguous lots of land upon each of seven of which stood a small single-family frame tenement house and upon the eighth a larger two-family frame tenement house, the whole encumbered by a first mortgage in the principal amount of $2,000 and accrued interest, and by various judgments and tax liens aggregating $4,192, exclusive of interest and costs, entered into a written agreement with defendant, Baroni, a real estate dealer, by the terms of which Baroni was to buy the mortgage, cause it to be foreclosed so as to discharge the inferior liens, take title from the sheriff, and thereafter collect the rents, make necessary repairs, pay the taxes, sell the properties on the best terms and conditions possible, and divide the profits, if any, with Smart in equal shares. Previously the mortgagee had made an offer to Smart ex gratia to accept $1,000 and accrued interest in full satisfaction of the mortgage, of which offer Baroni had been advised; and after the execution of the agreement of May 29, 1932, Baroni arranged with one Rotharmel for the latter to advance the money to buy the mortgage, hold it as security and cause it to be foreclosed. Accordingly, on June 10, 1932, Rotharmel advanced the required $1,100, which was paid over to the mortgagee, who then assigned the mortgage and bond to Baroni, and he in turn assigned to Rotharmel. Thereupon, Rotharmel had judgment entered upon the bond for $2,000 and interest, had execution issued, bid in the property at the sheriff's sale for costs amounting to $86.60, received a deed from the sheriff, subject to tax liens, and on August 10, 1932, conveyed to Baroni, who thereupon reimbursed Rotharmel in

full for the costs and expenses of the sale and repaid his loan, the total of these payments to Rotharmel amounting to $1,585.87. Having thus acquired title free of the inferior liens, Baroni effected a settlement of the delinquent taxes, completed a previously negotiated sale of the larger house and lot for $1,300, borrowed $1,500 on the security of a new first mortgage made by him upon the remaining seven lots, and on January 3, 1933, conveyed them all, subject to the $1,500 mortgage, to Ruth J. Frost, the other defendant, for a consideration of one dollar as expressed in his deed to her recorded on January 5, 1933. Subsequently, by her deeds dated respectively December 1, 1939, April 4, 1940, and February 3, 1942, Mrs. Frost conveyed three of the lots for a total consideration of $4,300.

The Commonwealth contended at trial that the conveyance by Baroni to Mrs. Frost was merely colorable, and that large profits were realized by her and Baroni from the proceeds of the lots disposed of and from the rents collected over a period of more than 10 years. It was shown that at the time of the conveyance to her she was an employe in Baroni's office, and Smart testified that she had told him in the fall of 1942 that she was familiar with the terms of his agreement with Baroni. There was testimony that the property consisting of the eight lots and the improvements thereon had in 1933 a value of between $10,000 and $12,000.

For the defense evidence was adduced to the effect that by the end of 1932 Baroni had paid out $5,271.77, including sums expended for repairs to the houses, and had received from all sources only $3,100; that he had then sold the seven lots, not to the defendant, Frost, but to her husband, Walter Frost, for $3,100, the price including the assumption by the purchaser of the $1,500 mortgage, leaving Baroni from the sale $1,600 in cash, the deed having been made to Mrs. Frost at the direction of her husband, who has since died; that

before making the sale Baroni had informed Smart of the money he had tied up in the property, of his inability during the depression to find purchasers for the remaining houses, and of his decision to try to get his money back by disposing of the entire property as best he could, unless Smart would assist in financing the proposition, whereupon Smart had said that he was not in a position to do so, and had agreed that Baroni should sell the property so as to recover the money he had laid out; that following the sale Mrs. Frost had expended several thousand dollars on extensive improvements; and that she still has a considerable investment in the property.

On substantially the same evidence defendants were previously tried and convicted before our president judge on a companion indictment charging them with fraudulent conversion, but a majority of the court set the verdict aside and ordered a new trial, holding that to establish a fraudulent conversion it is essential that the property alleged to have been converted should have been owned by the prosecutor and not merely owed to him by reason of a contractual obligation, whereas the money alleged to have been converted by these defendants was not owned by Smart, the property from which it was received having been transferred to Baroni by operation of law and the former's title completely divested so far as the two of them were concerned, after which transfer Smart's right was to have not the proceeds of the lots resold or the rents collected or any specific or segregated money, but only a division of profits, if profits were realized: See Com. v. Baroni and Frost, 7 Fayette L. J. 176.

If, then, as we have already held, Smart retained no such interest in the property or its proceeds as would support a charge of fraudulent conversion by defendants, it is obvious that they cannot be held to have conspired to commit that offense. There can be no conviction of conspiracy to commit a particular crime

when the act to accomplish which the combination was formed lacks an essential element of the crime: Cf. United States v. Crawford et al., 52 F. Supp. 843.

It is argued on behalf of the Commonwealth that the true intent'and meaning of the agreement of May 29, 1932, was to make Baroni a trustee for Smart, thus reserving to the latter the beneficial ownership of the property. It must be seen, however, that even if the agreement were intended to create a trust in Smart's favor upon Baroni's obtaining title, considerations of public policy would absolutely forbid our regarding the transfer of the property as subject to such reservation. The agreement clearly reveals a collusive scheme to divert the embarrassed debtor's property from the payment of his debts through a transfer without a fair consideration, in contravention of the Uniform Fraudulent Conveyance Act. Such a transaction is not saved merely because the form of a judicial remedy is used to supply a protective cover for the fraudulent design: Shapiro v. Wilgus et al., Receivers, 287 U. S. 348, 77 L. Ed. 355; Bunn, Raiguel & Co. v. Ahl, 29 Pa. 387; Gill, for use of Rankin, v. Henry, 95 Pa. 388; Kennedy, Assignee, v. Borie et al., 166 Pa. 360; Lefkowitz v. Finkelstein Trading Corp. et al., 14 F. Supp. 898; Ever-Ready Label Corp. v. Stuyvesant Photo Engraving Corp. et al., 36 N. Y. S. 2d 468; 27 C. J. 458, 460, §§91 and 92. It is true that the mortgage originally represented an honest obligation, but the sole object of its purchase was to enable Baroni, with Smart's connivance, to manipulate matters so as to foreclose the rights of other creditors. That object is not only openly avowed in the agreement itself, but is apparent in the proceedings that followed. Promptly upon obtaining control of the mortgage, Baroni caused judgment against Smart to be entered by confession on the accompanying bond for twice the amount paid for the assignment and accordingly for twice the amount for which he was entitled by the terms of

the agreement to be reimbursed. The property was then exposed to sale, not in parcels but as a whole, though a sale of one of the lots had already been negotiated and the down money was in Baroni's hands. The result of these maneuvers was that for a comparatively small advancement by Baroni, all of which was immediately recouped by closing the sale of the one lot and borrowing the value of one more upon the security of the seven that remained, the agreed transfer was colorably accomplished, and Smart's creditors thus forcibly shaken off. In these circumstances the fact that the transfer was accomplished through execution process cannot alter its fraudulent character, and therefore no secret trust for Smart's benefit could be lawfully created by such means. As between him and Baroni the execution sale must be given the effect that they intended it to appear to his creditors to have, that is, a complete divestiture of all his right, title, and interest in the property. It ought, it seems to us, to go without saying that courts of justice cannot recognize the validity of a fraudulent debtor's claim to the fruits of his fraud. The fundamental principle involved was stated with forceful clarity by Chief Justice Gibson in a case that went up from this county more than a hundred years ago:

". . . No dictate of duty calls on a judge to extricate a rogue from his own toils. On any other principle a knave might gain, but could not lose, by a dishonest expedient; and we should but administer provocatives to unfair dealing, did we repair the cross accidents of an unsuccessful trick. It is, therefore, in accordance with a wise and liberal policy which requires the consequences of a fraudulent experiment to be made as disastrous as possible, that a fraudulent bargainee is assisted—assisted for no merit of his own, but for the demerit of his confederate": Stewart v. Kearney, 6 Watts. 453. See also Bunn, Raiguel & Co. v. Ahl, supra; Gill, for use of Rankin, v. Henry, supra; Ken-

nedy, Assignee, v. Borie, supra; Dent. v. Ferguson, 132 U. S. 50, 33 L. Ed. 242.

We conclude that defendants' demurrer at trial should have been sustained. This conclusion renders unnecessary a consideration of other reasons assigned and urged for the granting of a new trial.

## Dissenting opinion

DUMBAULD, P. J., August 23, 1945.—The conclusion reached by the majority of the court is so utterly in conflict with the facts, law, and inherent justice of the case, as they impress themselves upon me, that I am compelled to dissent and to place on record my reasons for such dissent.

Early in 1932, William H. Smart found himself in financial difficulties. At that time he was the owner of the legal title to eight contiguous lots of land, situate on Locust Street, in the City of Uniontown. On each of seven lots was located a frame house, of sufficient size to house a single family. Upon the eighth there was a double house.

These properties, as a whole, were encumbered by a purchase money mortgage in the sum of $9,000, reduced by payments to $2,000 with interest. Tax liens and judgments entered by other creditors after he acquired title aggregated $4,192, exclusive of interest and costs. There were thus encumbrances amounting to $6,192, with interest, when Baroni accomplished a sale of the corner lot with the double house for $1,300. In an effort to make title to the purchaser of the lot, the encumbrances above-mentioned prevented completion of the deal.

It must be apparent that, at that time Smart had an equity in the properties equal to the difference between $6,192, with some interest, and the value of the properties. In the correspondence between Baroni and Smart, Smart suggested a sacrifice price of $8,000 for the whole. The uncontradicted testimony of real estate

dealers at the trial was that, in January, 1933, the lots had a market value of from $10,000 to $12,500. Obviously Smart had a substantial equity over and above all the encumbrances. In an effort to realize this equity, when approached by Baroni at his home in Lock Haven, he entered into the agreement of May 29, 1932, as follows:

"This will authorize you to buy the mortgage against my properties located on Locust Street, Uniontown, from Miss Sturgeon and to sell them later after foreclosure on the best terms and conditions possible, acting as rental agent in the meantime for the houses. Such taxes as are due or may become due are to be paid and necessary repairs to make the properties salable are to be made and paid for and the profits, if any, are to be divided equally between us, and my share is to be remitted from time to time as they are made. It is understood that you will do everything possible to advance our joint interests in the transaction. This letter is to be binding on us both when you sign an acceptance on even date herewith."

This agreement is not obscure. It is not fraudulent. It is not collusive. It simply creates the relationship of principal and agent for specific purposes between Smart and Baroni. Whether he remained throughout simply the agent or whether his conduct placed upon him the additional responsibilities of a trustee, makes no difference in the final analysis. The salient point is that the relationship is created by the document itself and is not to be established by the court in the trial of this case. He is authorized to buy the first lien; to acquire by purchase the title at sheriff's sale in the foreclosure proceedings; to repair the houses; to pay present and future taxes; to rent in the meantime; and finally, to sell and remit to Smart profits on the basic of an equal division.

Baroni was at the time a real estate broker. He dealt as such. He became the agent for Smart for

remunerative compensation, to acquire, rent, repair and sell Smart's property, valued at from $8,000 to $12,500, encumbered by liens and taxes amounting to $6,192—all in accordance with the terms of the written agreement. The transaction by which he acquired title in his own name in no wise changed this relationship. As to third parties, after he obtained the deed in August 1932 Baroni had the full right to convey legal title. Between Smart and himself he remained the agent. He continued to be bound by all the principles of loyalty and fidelity which good morals, sound law, and supervening equity impose upon real estate agents. Neither in law nor in equity could he take from Smart any ownership or any title, except as provided in the agreement—the right to retain half the profits.

Textbook and decision make this point crystal clear. The agent stands in the classification of a fiduciary to his principal, and in all of the deals he must serve the employer with the utmost good faith and loyalty. It is his duty to make known all matters affecting transactions which may be of importance to the one for whom he acts. He must not speculate in subject matter of agency, conduct a rival business, sell to himself, make any secret profits, or, without disclosing the fact, ask for compensation from both buyer and seller.

See 3 C. J. S., §§138, 142, 144(a), 144(c), 154(c), 154(a), 163, 165. Allegheny By-Product Coke Co. v. Hillman & Sons Co., 275 Pa. 191; Shepard & Co. v. Kaufman, 88 Pa. Superior Ct. 57; East & West Coast Service Corporation v. Papahagis (No. 1), 344 Pa. 183.

The record shows abundant proof that Baroni strictly carried out the terms of the agreement until he acquired title in his own name. He immediately began to exploit the properties. He completed the sale of the corner lot, collecting the $1,000 balance due on the purchase money. He had accepted a down-payment of $300 on this lot before the making of the agreement

of May 29, 1932. He mortgaged the remaining lots for $1,500, which sum he retained. He immediately took charge of the collection of all the rents. He kept no account of rents received, but places the amount so collected from August 1932 to January 1933 at $300. He claims payment of taxes in the amount, as filed with the sheriff at the time of sale, but fiscal records leave the date of payment and the amount of taxes paid in doubt.

All this transpired between August 1932 and January 3, 1933, when, without notice to Smart, he conveyed all the properties, together with some other holdings to his clerk, confidant and constant companion, Ruth J. Frost, for the consideration of $1 named in the deed, for the actual consideration of $3,100, as testified by defendants.

He continued to execute leases in his own name. Receipts for rent were taken in his name, the money frequently being received by Ruth J. Frost and the receipt executed in his name and signed by her initials. Sales of several of the properties were negotiated by him and up to the time of the trial there was no change in the handling and managing of these properties.

The jury, under ample instructions, found that out of these transactions there were profits and that the two defendants, with fraudulent intent and knowledge of the existence and tenor of the agreement on the part of the defendant Frost, confederated and agreed to accomplish the withholding of Smart's share of the profits, using the deed to Frost and other instrumentalities to accomplish such withholding.

The jury was told (page 1378 of the record) :

"Your problem in that respect will be in a consideration of that conveyance that is in and of itself an agreement whereby she became the holder of the legal title to these properties by virtue of a deed from Baroni. Your question will be to determine whether, from the circumstances that surround that transaction and the

circumstances that have followed that transaction down to the date of the bringing of this indictment there was an understanding between these two people that that deed, that agreement to convey, was to be made the instrument by which Smart was to be deprived of his share of the profits in the disposing of the property. That is the heart of this case. All of the other testimony simply bears upon collateral questions that are at issue here. Was there an understanding between them that this deed from him to her was to be made the instrument by which the agreement to divide profits arising out of the real estate would be voided and Smart's part of such profits withheld if there were profits? As you decide that question, your verdict should turn. If there was an understanding or an agreement that this conveyance was to be so used, then these defendants are guilty as indicted.

"If there was no such understanding; if it was a good-faith business transaction on the part of either one of them and if the deed was not to be made an instrument by which Smart's money was to be withheld, then the defendants are not guilty and your verdict should be such": Commonwealth v. Smith et al., 151 Pa. Superior Ct. 113.

The answer of the jury was that both defendants are guilty. As suggested before, the testimony is ample to support this finding.

Notwithstanding the unequivocal language of the agreement and the relationship which it, by law, creates, and the clear cut verdict of the jury as to the vital facts, the majority invokes a "consideration of public policy", the result of which is to repeal and annul all the rules of loyalty and fidelity, good-faith and fair dealing, which morals, law and equity have from time immemorial imposed upon the agent in dealing with his principal, and to estop the Commonwealth from placing its strong hand on the real estate broker, who contracts for half the profits of a transaction and

by manipulation with a willing actor, with knowledge, takes the whole, and fraudulently shares with her the fruits thereof.

The judgment of the majority, in my opinion, is based upon two erroneous conceptions:

(*a*) That the agreement of May 29, 1932, is collusive and fraudulent as to the creditors of Smart; and

(*b*) Even though collusive and fraudulent as to Smart's creditors, the agreement worked a breach of the relationship between Smart and Baroni and thus absolved Baroni from transmitting profits, as made, to Smart as provided in the agreement.

(*a*) I am completely at a loss to understand upon what premise the majority bases the statement that:

"The agreement clearly reveals the collusive scheme to divert the embarrassed debtor's property from the payment of his debts through a transfer without a fair consideration, in contravention of the Uniform Fraudulent Conveyance Act."

In this connection I must again refer to some of the salient facts. In 1932, Smart was an embarrassed debtor. He was also an embarrassed lot owner. Acting for him, Baroni negotiated the sale of one of the eight lots for $1,300. Transfer of title was prevented by a purchase money mortgage, on which there was a balance of $2,000, with some interest. Taxes and other liens added to the encumbrances $4,192, with costs and interest. Sale of these lots for taxes either had been made or was imminent. Smart offered the holder of the purchase money mortgage a part of the consideration for a release of the corner lot. This was not satisfactory. In desperation, he wrote to Baroni, suggesting a sacrifice sale of the whole for $8,000, the liens to be paid, Baroni to be paid his commission and he to get the balance.

What was the alternative? Dr. Sturgeon's testimony clearly discloses that the holder of the purchase money mortgage was about to foreclose for the balance

of the mortgage, interest and taxes. She did not want to deprive Smart of his equity. To avoid foreclosure, she offered to take $1,100.

". . . After discussing it with my aunt, we felt that Mr. Smart had paid a good bit on this property up to that time and to try to foreclose when he was not able to meet the figure of $2,000 remaining was unfair. So I wrote to Smart to the effect that we would take $1,000 for the mortgage and interest, $1,000 and $100 interest, and let him have the mortgage . . ."

On pages 114 and 115 of the notes, Dr. Sturgeon continues:

". . . You asked me a question about the taxes . . . We talked that over. It was not the question of taxes taking the property from us. We were in position to pay the taxes. The question was whether we should take the property from Mr. Smart by paying the taxes and foreclosing the mortgage. There was enough houses there to cover the mortgage nicely, but we didn't think it was equitable or fair to take the property from Mr. Smart, for the sake of a $2,000 remaining mortgage, and paying the taxes."

Faced with this situation, in the presence of Justin M. Kunkle, a reputable real estate broker of our city, Baroni, Kunkle and Smart collaborated in the agreement of May 29, 1932, by means of which Smart sought to salvage a part of his admitted equity in these lots which, when disposed of in January 1933 had a fair market value of from $10,000 to $12,500.

It must be evident that the junior lien creditors would have been in exactly the same position at the public sale of July 9, 1932, by the sheriff of Fayette County, if the foreclosure proceeding had been inaugurated by the holder of the first lien mortgage, Miss Sturgeon.

The agreement provides for foreclosure. The lien creditors could not be kept in the dark as to this proceeding. The bond was entered of record. An execu-

tion issued. The sheriff levied on the properties. The sale was duly advertised. The defendants themselves went to considerable length to prove that Smart knew of the date of the sale and was present thereat.

At a sheriff's sale, publicly held, lien creditors must decide for themselves whether they will protect their liens by bidding on the property. Here was real estate worth at least $8,000. Other judgment creditors could have protected their claims by bidding $2,000, plus the taxes and their own claims in order, all not to exceed $6,192. This they failed to do, as happens in many, many cases. At a public sale, held in the broad, open light of day, no junior creditors made a bid and Baroni succeeded in getting the title in his own name, subject to all the duties of principal and agent as defined and set forth in the agreement. Creditors were not deceived or misled, except perhaps as to the $1,000 rebate by Miss Sturgeon. The total amount of the liens against the property, including that sum, together with the value of the land, make that fact immaterial.

The other judgment creditors stood by at the sale made by the sheriff publicly, after due advertisement, with nothing to prevent them from protecting their liens except their doubts and fears as to the value of the real estate involved.

There was no collusion or fraud as affecting junior lien creditors.

I also fail to find substantial basis for the statement of the majority that "The sole object of the purchase was to enable Baroni, with Smart's connivance, to manipulate matters so as to foreclose the rights of other creditors. That object is not only openly avowed in the agreement itself, but is apparent in the proceedings that followed . . . The result of these maneuvers was that for a comparatively small advancement by Baroni, all of which was immediately recouped by closing the sale of the one lot and borrowing the value of one more upon the security of the seven that remained,

the agreed transfer was colorably accomplished, and Smart's creditors thus forcibly shaken off." I have just shown that Smart's creditors were not "forcibly shaken off" but shook themselves off when they failed to put a price on Smart's equity at the public sale.

I have looked in vain for any authority, local, State or Federal, which holds that an embarrassed debtor and landowner is guilty of collusion and fraud when he contracts with a real estate broker to acquire the first lien, to foreclose thereon, to become the purchaser at the foreclosure sale, to rent, repair and sell the properties and divide with such broker the profits of such handling of the estate.

A contract similar in every respect was litigated and its legality determined in the case of Kramer v. Winslow, 130 Pa. 484, and the same case retried and reported in 154 Pa. 637.

(b) Admitting for the sake of argument that the agreement was collusive as to other lien creditors, the relationship between Baroni and Smart was in no wise changed. Baroni carried on according to the terms of the agreement until he acquired the title in his own name. He carried on while realizing from the property rents, the proceeds of a mortgage, and the purchase price of the sale of the corner lot. He carried on, he alleges, in making repairs and paying taxes. He failed only in dividing profits. He was carrying on, when, on January 2, 1933, the day before he deeded the properties to the other defendant, he wrote Smart at Lock Haven:

". . . The tenant on Locust Street are most of them on relief and the best I could do to chisel few dollars are of tham to pay the water rent, do that or have the houses vacant wich will be damaged to greater extent, and the mooto round here now is mark time and say nothing by this week or next I will get all bills together and make out an itemized statement and mail you a copie, and in mean time if is possible for me to gather

up few dollars I should be only to glad to send you some money . . ."

He was carrying on when, on the following day he completed a transaction which he says he had been carrying on with Ruth Frost's husband for some time, whereby he conveyed the entire area to Ruth J. Frost. He continued to carry on when he wrote to Smart on February 1, 1933, March 4, 1933, March 16, 1933, and April 15, 1933—in all of which letters he promises to see Smart with "good news" and in most of which he promises to bring money.

He has carried on in the collection of rents, the leasing of the dwellings and other items of management of the properties to the time of the trial.

To me it is inconceivable that any rule of public policy may be invoked in behalf of these defendants under circumstances such as are proven in the trial of this case.

No creditor of Smart is invoking the collusiveness of the agreement. No taxing authority is heard to complain. The only result, as the rule is applied by the majority, is to permit defendants to continue to enjoy in safety the whole of the profits arising from this real estate transaction where there was a solemn contract providing for only half of the profits as compensation and when a jury has fairly found from ample and competent testimony that these defendants conspired to withhold from Smart the profits which the agreement provided should be sent to him as made.

Such is not my understanding of the rule. The opinion of Chief Justice Gibson, in Stewart v. Kearney, 6 Watts 453, quoted strangely enough in the opinion of the majority, begins and leads up to the part quoted with these significant words:

"That a collusive contract binds the parties to it, is a principle which commends itself no less to the moralist than to the jurist . . ." immediately followed by the part quoted:

". . . for no dictate of duty calls upon a judge to extricate a rogue from his own toils."

Thus it is plain that whether collusive (which it was not), or otherwise, as to Smart's creditors, the agreement binds and continues to bind the parties to it and that agreement, as it has been pointed out again and again, provides that profits arising under the agreement shall be divided equally and Smart's part sent to him. Collusiveness as to creditors certainly did not confer upon the parties the right to steal from each other.

The jury having determined that fact, that there were profits to be divided and that Baroni and his clerk wilfully and fraudulently conspired to withhold these profits, exactly what is charged in the indictment, not a conspiracy to commit the crime of fraudulent conversion, the verdict should stand.

The judgment of the majority leaves these defendants in possession of the fruits of their fraudulent conduct—in unmolested possession of all the profits, where only half were contracted for. If any rogue is to be extricated from his toils in this case by judicial decree, obviously it is not the prosecutor who started out with a substantial equity in real estate, who bargained with a licensed realtor to salvage that equity for half thereof and who finished with neither land, credit nor money.

The logic and result of the application of the rule of public policy to the facts of this case go far toward making hijacking a respectable occupation.

The demurrer was properly overruled, the case fairly submitted to an intelligent jury, and verdict of guilty should be followed by sentence of the defendants.

[NOTE.—An appeal to the Superior Court from the foregoing decision of the majority was quashed on the ground that the order entered was interlocutory.]