217 U.S. 47 (1910)
WILL
v.
TORNABELLS.
No. 63.
Supreme Court of United States.
Submitted December 10, 1909.
Decided March 14, 1910.
APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR PORTO RICO.
*48 Mr. Frederick L. Cornwell and Mr. N.B.K. Pettengill for appellant.
No brief was filed for appellees.
MR. JUSTICE WHITE delivered the opinion of the court.
This appeal is taken to secure the reversal of a decree of the court below dismissing the bill of complaint. The court sustained its action by an elaborate opinion, and subsequently stated, in a formal way, its findings of fact and conclusions of law.
The evidence is not in the record, although a portion of the testimony is contained in the formal findings of fact, upon the theory that this was necessary to preserve the right to review the action of the court concerning objection urged by the defendants to the admission of certain testimony tendered on behalf of the complainants. The record, we are constrained to say, is unsatisfactory and confused, a condition which we assume has resulted from circumstances referred to by the court below in the opening passage of its opinion, as follows (3 Porto Rico, 125, 126):
"This is a creditors' bill filed June 23, 1902, and permitted to remain on the docket of this court during the five years that have since intervened, without any apparent proper or sufficient cause for the unwarranted delay and with infinite inconvenience to many parties connected with the subject-matter *49 of the controversy. The first two years and a half of the time seem to have been taken up with a battle over the proceedings, trying to get the answers of the several respondents settled, and during which time complainants' exceptions to several of the answers were referred to a master, arguments had before him, his report filed, exceptions to the same presented, arguments had on the latter and briefs submitted in support thereof, and so on, in an interminable and fruitless contest of petitions, motions, exceptions, pleas, demurrers, orders, affidavits and rules to show cause, without result or real merit as we see it. The next year and a half seem to have been taken up somewhat in the same way, and also partly in an application for a receivership and in opposing efforts to the same, and in efforts to prevent outside parties from foreclosing several mortgages they had on some of the premises involved, that they had secured in the meantime, in enjoining them from so proceeding and in issuing rules as for contempts against them for their actions in that behalf, etc."
In order to in some measure dispel the obscurity which must arise from the circumstances just referred to we briefly state, in their chronological order, certain unquestioned facts which gave rise to the controversy, and also outline the pleadings and proceedings, the whole for the purpose of enabling us to adequately test the sufficiency of the errors assigned.
For many years the firm of J. Tornabells & Co., composed of Joaquin Tornabells and Carlos Doitteau, was established in Porto Rico and there carried on a mercantile business. The firm was the owner of various trading establishments and warehouses, and was, besides, the owner of considerable real estate, embraced in which were extensive coffee plantations which the firm carried on, including the buildings, machinery and appurtenances incident thereto. It is not disputed that, presumably as the result of losses occasioned by a disastrous hurricane which devastated the island of Porto Rico the firm, prior to 1900, had become temporarily embarrassed, and, under provisions of the local law, had obtained in a local court *50 an extension of time for the payment of its debts. While we state the fact as to the suspension we shall nevertheless indulge in the assumption that such fact has no material bearing upon the questions here to be decided. We do this because no rights based upon such fact were asserted in the bill of complaint or passed upon by the court, and no right of such a character is asserted in the assignments of error or referred to in the elaborate argument filed on behalf of the appellants, the appellees not having appeared in this court either orally or by brief.
On May 9, 1900, Tornabells & Co., by deed before a notary public, conveyed to Luis Aran y Lanci the following property, as stated by the court below: "Its place of business and other town property, its stock of merchandise and twenty-six several pieces of real estate, most of them being coffee plantations and their appurtenances." The stated price was 197,700 pesos, provincial money, 30,000 declared to have been paid in cash, and the remainder to be paid in ten installments of 16,700 pesos, bearing no interest, maturing respectively from one to ten years. A few days thereafter, on May 11, 1900, Aran y Lanci mortgaged for 150,000 pesos nineteen of the twenty-six pieces of real estate thus conveyed to him. This mortgage was in favor of one Baudelio Duran y Cat and a firm styled Duran & Coll. The mortgage in favor of the first was for 130,000 pesos, divided into ten annual installments of 13,000 pesos each, evidenced by notes to the order of the mortgagee, maturing in each of the ten years, the whole being secured on fourteen of the twenty-six pieces of real estate. The mortgage in favor of Duran & Coll was on five of the pieces of real estate acquired as aforesaid, and secured twenty thousand pesos, divided into five installments of four thousand pesos each, maturing in each of five years. These mortgages were not indivisible, as the amount of each was apportioned among the various pieces of real estate, so that each piece was liable only for the sum secured on it. The sale to Aran y Lanci was recorded on May 21, and the mortgages just stated *51 on May 24, 1900. On June 25, 1900, the mortgage for 20,000 pesos, which had been executed in its favor by Aran y Lanci, was assigned by the firm of Duran & Coll to Raimundo Valdecillo to secure an indebtedness due him by the firm of 6,000 pesos provincial money, and this assignment was duly registered on July 5, 1900. Sixteen months after the conveyance to Aran y Lanci  that is, on September 16, 1901  the firm of Tornabells & Co. acknowledged by notarial act that Aran y Lanci had by anticipation fully paid the deferred purchase price (167,700 pesos). Nine months after such acknowledgment Aran y Lanci mortgaged in favor of the Banco de Solleir to secure 32,780 pesetas, Spanish money, one of the pieces of property previously mortgaged to Duran y Cat. On July 5, 1902, this mortgage was put upon record. A few days after it was so put upon record, viz., on June 23, 1902, the suit before us was commenced.
The bill  which was not sworn to  was originally filed on behalf of three commercial firms, Will & Co. of Cuba, David Midgley & Sons of Manchester, England, and Ramon Cortado & Co. of Ponce, Porto Rico, and the members of said firms, in their own behalf and in behalf of all others similarly situated who might intervene in the cause. It was alleged that the complainants were creditors of the firm of Tornabells & Co. at the time of the conveyance to Aran y Lanci and the execution of the mortgages by Aran y Lanci above recited, and that subsequent to said transactions the claims of the complainants had been merged into judgments against the firm, obtained in the court where the bill was filed, and that on such judgments executions had issued and been returned unsatisfied. It was further alleged that the conveyance made by Tornabells & Co. to Aran y Lanci, and the mortgages put by the latter upon the property in favor of Duran y Cat, and the firm of Duran & Coll, were fraudulent simulations, and that the property covered by the conveyance and the mortgages continued to belong to the firm, and was held by Aran y Lanci under a secret trust in favor of Tornabells & Co., the conveyance *52 and mortgages being mere fictitious devices adopted between the parties for the purpose of screening the property from creditors or hindering and delaying them in the recovery of their claims. It was further charged that at the time of the transactions referred to Tornabells & Co. was insolvent, that the alleged price mentioned in the conveyance to Aran y Lanci was largely below the real value of the property, and that, despite the alleged conveyance and mortgages, the firm of Tornabells & Co. continued to control the property conveyed and enjoy the fruits thereof. The prayer of the bill in substance was that a receiver of the property might be appointed, that the conveyance and subsequent mortgages and transfers should be declared to be fraudulent and void and be vacated and annulled, and that the property and each and every parcel thereof should be decreed to be subject to the lien of the several judgments. Tornabells and Doitteau, the members of that firm, Aran y Lanci, Duran y Cat, and Duran & Coll, and the members of that firm, were made defendants to the bill. Valdecillo, to whom the mortgage executed by Aran y Lanci in favor of Duran & Coll had been assigned, was also joined as defendant, he being called upon to establish the verity of his alleged lien. Alfredo Saliva, who was alleged to be the attorney in fact of and to have acted for Aran y Lanci in the transactions set out in the bill, was also made a defendant.
Separate sworn answers were filed on behalf of the members of the firm of Tornabells & Co., traversing the allegations of insolvency and of simulation and fraud, both as respected the conveyance to Aran y Lanci and the mortgages executed by the latter. The answers contained affirmative allegations as to the good faith of the conveyance to Aran y Lanci, the adequacy of the consideration and full payment thereof prior to the commencement of suit. The taking possession by and the exclusive control and management of the property conveyed, and receipt of the fruits thereof by Aran y Lanci for his exclusive use and benefit was also averred. An answer *53 substantially of like tenor, also sworn to, was filed on behalf of Aran y Lanci. Juan Coll, a partner in the firm of Duran & Coll, also answered, and averred the bona fides of the mortgage executed by Aran y Lanci to his firm and the transfer thereof made to Valdecillo.
On October 31, 1904, the firm of L.W. & P. Armstrong of New York City, unsecured creditors of Tornabells & Co., were made parties complainant to the bill. Thereafter, Ruffer & Sons, a firm doing business in London, England, and the Caja de Ahorros de Mayaguez, a Porto Rican corporation, as creditors of Tornabells & Co., were also allowed to intervene and become parties complainant.
Early in 1905 Tornabells died and the cause was revived as to him against his widow and children as his heirs. In November of the same year Aran y Lanci died, and the cause was revived against his widow, as administratrix of his estate. Doitteau, the surviving partner of Tornabells & Co., died on January 22, 1907, and the cause was revived against his widow and children.
Duran y Cat, an original defendant to the bill  in whose favor, as we have stated, Aran y Lanci had mortgaged fourteen of the pieces of real estate for 130,000 pesos  was not served with process and did not enter his appearance. He also died during the pendency of the cause. On February 12, 1907, upon motion of the complainants, an order was entered dismissing the cause as to the heirs of said Duran y Cat, "on the ground that said heirs, being out of the jurisdiction and having entirely disposed of their interest in the cause, are not indispensable parties thereto."
Journal entries are contained in the record, showing that more than a dozen firms or individuals became additional defendants in the cause. The time when they came in and the nature of the pleadings by them filed or the proceedings had concerning their rights do not distinctly appear. It is, however, fairly inferable that these new defendants came in long after the commencement of the suit, either during or *54 subsequent to the dilatory and confused proceedings referred to by the court in the excerpt heretofore made from its opinion, and that such defendants asserted rights claimed to have been acquired, after the filing of the bill, in the property affected by the suit, either as purchasers or as holders of mortgage notes. In this connection it is to be observed that neither when the suit was commenced nor at any time during its progress was the court requested by the complainants to award a cautionary notice, to be placed upon the public records, as a means of warning to parties who might deal with the property in controversy, thus preserving against them, pendente lite, the rights which might be ultimately established as existing in the complainants, and which would not have been preserved by the mere pendency of the suit, unaccompanied with the allowance and registry of the statutory cautionary notice.
Answers or amended answers were filed on behalf of the widow and administratrix of Tornabells, and by the guardian ad litem who was appointed for his minor children. An answer was also filed on behalf of the widow and administratrix and minor children of Doitteau. This also was the case as to the widow and administratrix of Aran y Lanci. These various answers were substantially in accord with those which had been previously filed on behalf of the original defendants, except that in one of them the prescription of one year was pleaded. It is inferable from the record that at this stage of the proceedings, or at all events at a time not earlier than four years after the commencement of the suit, certain persons who had acquired rights in or to the property, either directly from Aran y Lanci or through the mortgage executed in favor of Duran y Cat and Duran & Coll, sought to enforce their claims and were enjoined from so doing. At about the same time a receiver was appointed. The record is silent, however, as to whether the receivership was intended to apply to all the property in controversy or whether the receiver attempted to take possession under his appointment, although it would seem that to some extent he did so, since by the *55 final decree the receiver was ordered to settle his accounts, etc.
It came at last to pass in the spring of 1907 that the cause was heard and taken under advisement. It was disposed of in the summer of that year by the entry of a final decree dismissing the bill, and was followed nearly six months thereafter, on December 19, 1907, by the making of formal findings of fact and conclusions of law applicable thereto.
The facts found are embraced in fourteen numbered paragraphs. The first merely states in general terms the filing of the bill, makes allusion to the complicated proceedings which followed, the dismissal as to some of the defendants (presumably the heirs of Duran y Cat), the coming in of other parties, the ultimate joinder of issue and the submission of the cause. In the second is stated the fact that evidence was heard on behalf of the complainants and the submission of a motion for a decree dismissing the bill on two grounds, viz., the failure to prove the allegations of the bill and the prescription of one year. The third finding is as follows:
"3. The documentary evidence introduced on behalf of complainants and the testimony of all the witnesses do not prove the allegations of the bill so as to entitle the complainants to a decree in their favor declaring the conveyance from defendants Tornabells & Co. to defendant Aran, and the mortgage from defendant Aran to defendants Duran y Coll and Duran personally to be voluntary or made to hinder and delay the complainants in the collection of their debts."
The fourth, fifth, sixth, seventh, eighth and ninth paragraphs, in a summary way, find substantially, as we have stated them, the facts concerning the conveyance by Tornabells & Co. to Aran y Lanci, the execution of the mortgages in favor of Duran y Cat and Duran & Coll, and the divisibility of those mortgages, as well as the fact that the claims upon which the complainants sued, although in existence, were not reduced to judgment until some time after the execution of the conveyance and mortgages in question. In *56 one of the paragraphs it is stated that the property conveyed by Tornabells & Co. was substantially all that was owned by the firm at the time of the conveyance, and that Duran y Cat was a relative of the senior member of Tornabells & Co. By the tenth paragraph it is found that the mortgage asserted by the Banco de Sollier was one which Aran y Lanci had executed in favor of that bank on one of the properties acquired by him from Tornabells & Co., and was given to secure a debt due by that firm to the bank, that Aran y Lanci incurred no personal responsibility, and that he produced, as paid, the mortgage note identified with the act of mortgage executed in favor of Duran y Cat, which had been released or extinguished so far as the particular property was concerned. The eleventh paragraph stated that the mortgage asserted by the firm of Fritze, Lundt & Co., on one of the pieces of property conveyed to Aran y Lanci, was executed by the latter in favor of Fritze, Lundt & Co. to secure the payment of a current account for supplies furnished for the cultivation of properties included in the conveyance from Tornabells & Co. to Aran y Lanci, and that previous to the giving of the mortgage the advances made by the firm were secured by a pledge of one of the mortgage notes executed by Aran y Lanci in favor of Duran y Cat, which, when Aran y Lanci mortgaged the property in favor of the firm of Fritze, Lundt & Co., was produced by him as the owner thereof and cancelled. In this case, also, no personal responsibility was assumed by Aran y Lanci. The twelfth and thirteenth paragraphs state sales by Aran y Lanci, in 1903 and 1905, to named persons, of pieces of the property acquired by him from Tornabells & Co., and the production by Aran y Lanci, as extinguished and paid, of the mortgage notes resting upon the property so conveyed, identified with the mortgage in favor of Duran y Cat. The fourteenth paragraph simply embraced a general statement of the release of the Duran y Cat mortgage on the properties referred to in the tenth to the thirteenth paragraphs, inclusive, and that the mortgages and conveyances referred to in *57 such paragraphs "were, in each and every case, duly recorded in the Registry of Property prior to any record in the Registry of Property of the judgments obtained by complainants herein against Tornabells & Co., referred to in paragraph nine."
From the facts thus found the court drew the following conclusions of law:
"1. That the proof on behalf of complainants is not sufficient to entitle them to any relief under their bill of complaint.
"2. That there is not now, and never was, any such statute in Porto Rico as the statute of 13th Elizabeth in England, referring to fraudulent conveyances, because we have the civil law rule here instead of the common law. Every State in the Union has a reenactment of the statute of Elizabeth in some form or other among its laws. In the absence of it there is no rule of law preventing a debtor, even when insolvent, for even that does not take from him the power of disposition of his property, and paying his debts with it, or a portion of his debts, and preferring one or more of his creditors with absolute intent to hinder, delay or even to defeat other creditors. If the favored creditor receives no more than is due him, and permits the debtor to secure no advantage to himself, the transaction will be upheld.
"3. That the statute of limitations of one year, as fixed by article 37 of the mortgage law, is applicable to suits like the one at bar.
"4. That complainants, under the pleadings and proofs herein, are not entitled to subject the properties described in the bill of complaint herein to any lien, interest or decree, by which the complainants would be entitled to have the conveyance and mortgages described in said bill of complaint cancelled and annulled for the benefit of the said complainants.
"5. That the bill of complaint should be dismissed."
These conclusions were followed by the reproduction of portions of the testimony to preserve the right to review certain *58 rulings of the court respecting testimony offered on behalf of the complainants.
The assignments of error are seven in number. The seventh we at once put out of view, as it only charges generally that the court erred in dismissing the bill of complaint.
The sixth, fifth and fourth assignments concern rulings as to the admissibility of testimony, and the third complains of the action of the court maintaining the plea of prescription of one year. As these assignments cannot be disposed of without in some respect appreciating the merits, we temporarily forego considering them.
The remaining assignments, that is, the first and second, are as follows:
"First, the court erred in finding as matter of law that in Porto Rico there was no rule of law preventing a debtor, even though insolvent, from preferring one creditor over others with absolute intent to hinder, delay or even defeat the just claims of said others.
"Second, the court erred in finding as matter of law, from the facts found, that the above rule of law was applicable and in not finding as matter of law that the applicable rule was that a debtor could not transfer his property without any consideration for the purpose of delaying or defeating the just claims of his creditors."
It is apparent that these propositions assert that a twofold error was committed, first, in not applying to the facts as found the legal principle rightfully applicable; and, second, by erroneously stating the law in the irrelevant proposition which was mistakenly applied in deciding the cause. The first contention rests upon the theory that the facts found established that the conveyance and mortgages which the bill assailed were mere fraudulent simulations, and upon this assumption insists that the case should have been controlled by the law applicable to that state of fact instead of being governed, as it was, by considering how far, as a matter of law, a debtor, being insolvent, had a right, through a real and *59 bona fide transaction, to prefer one or more of his creditors. But when the findings of facts are considered it is manifest that the premise upon which the proposition rests is a false one, since it cannot be indulged in without disregarding the findings. We say this is manifest, because the third finding of fact, which we have already quoted, expressly declares that the documentary evidence introduced on behalf of the complainants and the testimony of all the witnesses did not establish that the conveyance from Tornabells & Co. to Aran y Lanci and the mortgage made by him to the firm of Duran & Coll and to Duran y Cat individually were "voluntarily made to hinder and delay the complainants in the collection of their debts." The error which would have resulted from applying the doctrine applicable to a mere simulated transfer to a case where the findings established that simulation was not shown is self-evident. This result, which necessarily arises from a consideration of the mere text of the third finding, is also demonstrated, if that finding be contemplated in the light of the issues which the cause presented in connection with the other findings and all the conclusions of law which were deduced therefrom and applied in deciding the cause. The essential charge which the complaint made was the fraudulent and simulated character of the conveyance and mortgages which were assailed. That issue was, therefore, the controlling question to be decided. Considering the findings, as we have previously fully stated them, it is, we think, clear that the third finding was intended by the court as a statement of its conclusion of fact as to that controlling issue, and that the first conclusion of law which the court stated, that is, the insufficiency of the proof to justify recovery by the complainants, was intended as the legal resultant of the finding which had established that there had been a failure to prove the charge of simulation.
We think it is also clear that the second proposition of law which the court announced, that is, the right of a debtor under the Porto Rican law, although insolvent, to give a *60 preference, in no way detracted from or modified the previous finding and conclusion as to the absence of proof of simulation or purpose to hinder and delay creditors in the conveyance from Tornabells & Co. to Aran y Lanci and the Duran y Cat and the Duran & Coll mortgage, but was solely intended as responsive to the findings in other respects. That is to say, we think the second finding of law was responsive to the facts found in the paragraphs other than number three, which tended to establish that, even although the sale from Tornabells & Co. to Aran y Lanci was not simulated and not intended to hinder and delay creditors, nevertheless Aran y Lanci had discharged a portion of the credit price which he had agreed to pay by making payments to third persons, creditors of the firm of Tornabells & Co., in extinguishment of the indebtedness of the firm to such creditors, and thus to the extent of such payments preferring the creditors paid out of the price due to Tornabells & Co. as the result of the sale.
Indeed, unless the appreciation which we have just made of the findings and the conclusions of law deduced therefrom be correct, it would cause the findings of fact to be absolutely silent on the issue of simulation, although that issue was the controlling one in the cause, an issue indeed so essential that it is impossible to conceive that the cause could have been disposed of on its merits without a finding on the subject. But if the findings could be thus envisaged the inquiry would be at once suggested whether they were not so manifestly irresponsive to the case as made by the pleadings and to the facts necessarily involved in the decision rendered as to cause them to be no findings at all, and therefore to require at our hands an affirmance of the judgment because of the substantial absence of any finding to enable us to review. Gray v. Smith, 108 U.S. 12. Concerning this suggestion, however, we express no opinion, since we do not consider that the findings are of the unsubstantial and irrelevant character which would result from attributing to them the construction contended for by the appellants.
*61 Our conclusion that the findings of fact exclude the contention concerning the simulated character of the assailed contracts renders it unnecessary to review the authorities cited in argument to establish the proposition, which is not challenged, that under the law of Porto Rico creditors possess the right to set aside mere fraudulent and simulated contracts or conveyances made by their debtor to or in favor of an interposed person, in order to place the property of the debtor apparently in the name or under the control of such person for the purpose of defeating creditors.
The substantial foundation upon which the cause was based, that is, the issue as to the simulation of the conveyance to Aran y Lanci and the mortgage to Duran y Cat and the firm of Duran & Coll being disposed of, the remaining contentions are free from difficulty. We say this because, although it is elaborately insisted that putting the question of simulation out of view, the court was wrong in its second legal conclusion, to the effect that the law of Porto Rico did not avoid a real and otherwise valid contract merely because its result was to prefer one or more creditors of the debtor making the contract, we think such contention is shown by the record to be an afterthought, or if not is unsupported by the provisions of law which are cited to maintain it. An afterthought because the entire theory of the bill was opposed to the conception that the assailed transactions merely embodied preferences giving rise to a revocatory action that is merely to have an otherwise valid contract revoked. Indeed, it is difficult to imagine that the action in any aspect was considered as but revocatory in character when it is borne in mind that although the mortgage in favor of Duran y Cat covered fifteen pieces of real estate securing 130,000 pesos, he was not served with process, and after his death, on motion of the complainants, the cause was dismissed as to his heirs, upon the theory that they had no interest in the result. We say that the contention as to preference, if not an afterthought, is unsupported by the provisions of law relied upon, *62 since those which are referred to plainly relate to cases of simulation, and even if applicable to a question of preference, tend to support the view stated by the court in its second conclusion of law. For instance, the military order of March 5, 1899, deals but with simulated transfers, and when its context is considered we think also concerns alone sales made seemingly for cash, and therefore, for a twofold reason, is inapposite to the question of mere preference arising from a contract for a legal consideration, although not immediately payable in cash. So also the general provisions of article 1101 of the Civil Code, providing that those who fraudulently neglect to fulfill their obligations are liable in damages, those of article 1275, declaring that contracts without a consideration or with an illicit consideration can have no legal effect, and the terms of article 1276, providing that the statement of a false consideration in contracts shall render them void unless it be proven that they were based on another and licit consideration, may be put out of view, since they simply announce undisputed propositions of law which are not involved in the case before us, and which are not disputed by any one. And a like reason is also adequate to dispose of the contention based upon the third paragraph of article 1291 of the Civil Code, which embraces in the enumeration of contracts which may be rescinded "those executed in fraud of creditors when the latter cannot recover in any other manner what is due them." We say this, since this provision clearly limits the right of the creditor to rescind to cases where he cannot otherwise recover his debt without resorting to an action for rescission, and even in such case only confers such right where the contract sought to be rescinded is one which is in fraud of his rights. To contend, as is in effect done in the argument at bar, that the article gives to a creditor a right to sue to rescind any contract made by his insolvent debtor, simply because without rescission the creditor cannot otherwise recover his debt, is to distort the clause by misconceiving its obvious meaning. The power to seek rescission being thus *63 limited to contracts which are in fraud of the rights of the creditor, the question is, Did the court below err in holding that under the law of Porto Rico contracts made by an insolvent debtor which were not fraudulent simulations, because made upon adequate consideration, are not susceptible of being rescinded merely because their execution operated a preference in favor of a creditor? We are cited to no express provision of the local law, or referred to any decision so interpreting that law, and we think an analysis of the provisions of the local law relied upon for the purpose of inferentially showing that the court below erred, clearly not only do not support but refute the contention we are considering. Thus the provision expressly authorizing the right to rescind payments made by an insolvent debtor on account of obligations which, at the time of making the payments, the debtor could not be compelled to make (Civil Code, art. 1292), plainly import the validity of such a payment under other circumstances. So, also, the provision creating a presumption of fraud as to alienations for valuable consideration made by an insolvent debtor against whom a condemnatory judgment has been rendered or a writ of seizure of property has been issued (Civil Code, art. 1297), also gives rise to the inference that where these circumstances do not exist the contrary rule would apply. And the inferences which are deducible from the text of the code are cogently fortified by a consideration of the mortgage law. Thus, while the law contains an enumeration of the suits which may be brought for the rescission of conveyances made for the purpose of defrauding creditors, and includes those made without consideration when the third person was a party to the fraud (Mortgage Law, arts. 36 and 37), it does not mention the case of a mere preference resulting from a contract made for an otherwise valuable consideration. So, also, in article 39, the conveyance without consideration to defraud creditors is expressly limited to those where "there was no price or its equivalent, or any preexisting obligation which had fallen *64 due," an affirmative prohibition which would seem necessarily to exclude a right to rescind a contract because of mere preference where there was a price or its equivalent, or where the consideration was a preexisting obligation which had fallen due.
The foregoing considerations cause it to be unnecessary to pass on the error which it is alleged was committed in maintaining the plea of prescription of one year. It remains therefore only to dispose of the errors based upon the action of the court in disposing of objections to testimony. They relate to two subjects, the first to objections made to the admissibility of the testimony of Mr. Cornwell, one of the attorneys of record of the complainants, concerning statements made to him by members of the firm of Tornabells & Co. in reference to their intention to dispose of or mortgage their property, and the other to the testimony of the same witness concerning statements made to him by the widow of Tornabells after the death of her husband, and during the pendency of the cause, as to alleged conversations had by her with her husband tending to show the simulation of the contracts which were assailed. To pass upon the contentions on these subjects a statement of what transpired at the time the evidence in question was proffered and of the action of the court thereon is essential. While testimony was being taken in open court Mr. Cornwell, one of the attorneys for the complainants, was offered as a witness on their behalf. It developing at once from the questions put to him that the purpose was to draw from the witness statements made to him by the members of the firm of Tornabells & Co. shortly before the assailed conveyance and mortgage were executed, objection was made that such statements were incompetent, because at the time they were made Cornwell was the attorney for the firm and its members, and therefore the statements were not admissible because privileged communications. Thereupon the examining counsel, while not denying that at the time the statements were made the relation of attorney and client existed, insisted that the *65 statements were admissible, because their character was such as to cause them to be outside of the privilege. The court declaring that it would reserve its ruling on the objection until it had an opportunity to examine the subject during the noon recess, the examination of the witness proceeded for the purpose of showing his professional relation to the firm of Tornabells & Co. at the time of the making of the statements. When the court convened after the recess the subject of the admissibility of the offered testimony was at once taken up. The court intimating doubt on the subject, the counsel making the objection declared that he had witnesses present by whom he expected to prove that Mr. Cornwell not only was the confidential legal adviser of Tornabells & Co. at the time the statements were made to him concerning which it was desired to question him, but that he continued to act for that firm as their attorney after the assailed contracts were made up to the time of the bringing of this suit. Answering this statement, the counsel for complainants declared that his position was that the offered proof was irrelevant in view of the ruling in Dent v. Ferguson, 132 U.S. 50, to the effect that the privilege did not extend to statements made by a client to his attorney of the intention of the client to commit a fraud. The court then announced as follows: "I am going to permit Mr. Cornwell to testify, reserving the right to see what it is, giving to all the counsel a right to except." Upon this announcement counsel for the defendants insisted upon being permitted to call witnesses to establish the existence of the professional relation of the witness with the firm as previously stated and proceeded to do so. After testimony had been given and documentary evidence introduced without objection, tending to show the existence of the relation of attorney and client between the witness and the firm of Tornabells & Co., in accordance with the previous declaration as to what was proposed to be proven on that subject, the court interrupted the taking of the testimony as follows:
*66 The Court: It doesn't change the court's mind as to admitting the testimony in the way it intimates. It will let it in.
"Mr. Dexter: I desire to except against that ruling.
"The Court: Give an exception to all counsel that wish it.
"Mr. Dexter: I want my objection to clearly appear: (1) It is incompetent because of the relation of attorney and client;
(2) It is incompetent under the United States statute; and
(3) Because of the party being dead.
"Mr. Boerman: I want an exception to every question given."
The witness Cornwell was then recalled and was fully examined and cross-examined, not only in regard to the alleged statements, but as to his professional relations with the firm of Tornabells & Co. when the statements as to which he testified were made, and thereafter up to or nearly about the time of the bringing of this suit.
Beyond question, the testimony established that the witness had been the confidential legal adviser of the firm of Tornabells & Co. up to and at the time when the statements as to which he testified were made. Without reproducing the testimony as to the statements, we think it suffices to say that on the examination-in-chief of the witness he repeated a conversation had with both members of Tornabells & Co. a short while before the making of the conveyance to Aran y Lanci and the mortgage by the latter of the property, which conversation was occasioned by the fact that the members of the firm called upon the witness as their legal adviser, either to consult him or to state to him the purpose of the firm to convey or mortgage its property, and that the witness, on his examination, stated that he construed the statements made to him by his clients as unfolding a purpose on their part to make a simulated transfer of their property to defraud their creditors, and that he, the witness, declared he could not represent them in the matter or have anything to do with it. The second statement testified to a conversation had with Doitteau, one of the members of the firm, after *67 the assailed conveyance and mortgage had been put upon the record, which the witness considered was an admission by Doitteau of the fraud and an explanation on the ground that he consented to it because of the influence of his partner Tornabells. It is also true, however, that the statements made by the witness on cross-examination tended to qualify the impression as to the conversation resulting from his statements-in-chief, and to indicate that the purpose of the members of the firm, as disclosed by them in the conversation, was either to sell or mortgage their property in order to raise money to apply to their debts, and that the witness thought that this purpose was illegal, because it was intended with the funds which might be raised to prefer particular creditors. It was established that at the time of the first conversation the witness, although the attorney of the firm, had to its knowledge the claim of one of its creditors in his hands professionally. It was also stated that after the conversations above referred to and after the witness had knowledge of the existence of the assailed conveyance and mortgage, he continued both to have personal and professional relations with the firm. He brought a number of suits in its behalf during the two years which elapsed between the making of the assailed conveyance and mortgage and the bringing of this suit. In fact, the claim which was in the witness' hands at the time of the conversation with the members of the firm was some time afterwards merged to judgment by a confession by the members of the firm, which was written in the office of the witness by one of his associates. Precisely when the witness became the counsel for all the complainants does not exactly appear, but certain is it that he stated in his testimony that he was to receive a large contingent fee, amounting in several of the cases to fifty per cent of the amount recovered. The case, as we have at the outset said, was decided some months after its submission, and six months thereafter the statement of facts to which we have referred, accompanied with extracts from the evidence, was *68 certified by the court. After reproducing in the statement the extracts from the testimony the court said:
"As appears from the above the court tentatively allowed the foregoing evidence of said witness Cornwell to be admitted, but subsequently, upon the consideration of the testimony as a whole and upon making its findings of fact and law and rendering its decision herein, the court did determine and rule that defendants' objections to the testimony of said witness, Cornwell, in so far as same related to conversations between said witness and Joaquin Tornabells, Carlos Doitteau and Luis Aran, should be sustained and said testimony excluded, because the plan outlined by said Tornabells during said conversation did not constitute a fraud upon creditors under the laws of Porto Rico at that time in force, hence the privilege existing as to confidential communications between attorney and client was applicable thereto, and further, because such testimony involved admissions of a dead man against the interests of his own heirs, who are parties to the suit."
It is upon this statement that the contention is based that the court illegally rejected the testimony of the witness Cornwell. But, when the statement is accurately considered, it appears that instead of rejecting the testimony the court weighed and considered it, and but declared that on its face it did not tend to establish a fraud within the meaning of the Porto Rico law, and hence that the statements were privileged. As the fraud on the part of the firm of Tornabells & Co. which was charged in the bill, and the fraud which it was insisted was demonstrated by the statements made to the witness were in substance one and the same, it necessarily follows that the finding of the court, that the statements testified to did not tend to show the fraud which it was asserted they did show, was but an expression of the conclusion of the court upon the facts involved in the merits of the controversy, and therefore is embraced in its finding of fact which we may not review. If, however, we could otherwise consider the action of the court, we are constrained to say, upon an examination of the *69 testimony of the witness, made part of the certificate, that we think the court was right in concluding that the testimony did not establish a sufficient foundation to relieve the witness from the obligation resting upon him as the result of his professional relations.
The error which it is insisted the court committed as to the statements of the widow of Tornabells need only be briefly noticed. In the course of his examination the witness Cornwell was asked concerning statements made to him by Mrs. Tornabells of conversations which she stated she had with her husband, tending to show that the assailed contracts were simulated, the statements to the witness having been made after the death of Mr. Tornabells. In reference to the motives which induced Mrs. Tornabells to make to him the statements about which the witness was asked, he said that she represented herself to be in great pecuniary distress and was desirous of ascertaining whether she and her children could not in some way be benefited if the pending suit assailing the conveyance and mortgage of the property was successful. Indeed, on cross-examination, the witness said:
"Q. Is it a fact, Mr. Cornwell, that a contract was made between your firm and this woman to give her either money or property?
"A. If it was, it was made afterwards by Judge Pettingill and Mr. Horton.
"Q. I am asking you if it was.
"A. I don't know. I am out at the mill the most of the time."
On objection being made to the witness testifying to the statements of Mrs. Tornabells as to the conversations with her deceased husband, the court declared that the objection would be overruled pro forma, with a right to sustain it later, and gave counsel for the defendants an exception. Thereupon the counsel for the complainants declared as follows:
"I want to get on the record that it is not claimed by the complainants that this statement, whatever it may be, made *70 by the widow of Tornabells as a defendant in this case, binds any defendant or is admissible against any defendant except herself and the minor children whom she represents."
After this declaration the witness testified as to the statements made to him by Mrs. Tornabells concerning conversations with her husband, the substance of which tended to show that the assailed contracts were fraudulent simulations. Although the testimony was thus in the case when it was submitted to the court for decision, in its certificate appended to the statement of facts to which we have already referred the court said that in disposing of the case it, in effect, concluded that the statement by Mrs. Tornabells as to the conversations with her husband were inadmissible, because they were hearsay, Mrs. Tornabells not having been called as a witness, and because, in any event, it was incompetent to establish the want of good faith in written contracts made by a deceased person by repeating conversations had with him during his lifetime. Conceding that the action of the court can be construed as indicating that it rejected the testimony instead of simply weighing it, and found it insufficient to prove the alleged fraud, we think it suffices to say, without further elaboration, that the reasons stated by the court are, on their face, adequate to sustain its conclusion. Besides, as the testimony of the witness Cornwell concerning the statements made by the widow Tornabells was offered only as against her and her children and not against the other defendants, it clearly results that no prejudicial error could in any event have resulted from the ruling, even on the hypothesis that the administratrix was competent by a mere admission to injuriously affect the estate of her minor children, which the court made, in view of its finding as to the rights of the other defendants.
Affirmed.