### ROBERTS et al. v. CRISS.

(Circuit Court of Appeals, Second Circuit.    May 12, 1920.)

No. 178.

1. **Abatement and revival** ⟐⟑69—**Suit does not abate on death of party pending writ of error.**

   As a general rule, the death of a party pending a writ of error furnishes no ground for abatement of the suit.

2. **Appeal and error** ⟐⟑334(6)—**Effect of failure of representative of deceased party to come in stated.**

   Under rule 19 of the Circuit Court of Appeals (150 Fed. xxx, 79 C. C. A. xxx), providing that on the death of a party pending a writ of error or appeal the adverse party may procure an order requiring his representatives to come in and be made parties, and that unless they do so the moving party, if plaintiff in error, shall be entitled to open the record and have the cause heard and determined, where such representative fails to come in pursuant to the order, he is not entitled to be heard, or to recover costs in case of affirmance.

3. **Contracts** ⟐⟑113(4)—**Contract requiring violation of rules of exchange by member illegal.**

   A contract between a member of the Stock Exchange and another, under which such member was to use his membership in violation of the rules of the Exchange, is illegal.

4. **Contracts** ⟐⟑138(1)—**Illegal contract cannot be made basis of suit between parties.**

   A contract, the basis of which is the violation by one of the parties of a contract with a third party, will not be enforced by a court as between the parties.

---

⟐⟑For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the South-- ern District of New York.

Action by Jesse Nevin Roberts and another against Hugh Ferguson Criss. Judgment for defendant, and plaintiffs bring error. Pending appeal, defendant below died, and Helen G. Criss, administratrix, appeared on order. Affirmed.

The plaintiffs are citizens of the state of Ohio and residents of the city of Cincinnati, in that state. The defendant is a citizen of the state of New York and a resident of the Southern district therein. The complaint avers: That on January 3, 1905, the plaintiffs and the defendant, together with one Thomas B. Criss, since deceased, entered into a partnership under the firm name of Roberts, Hall & Criss. That the firm was formed to conduct a general broker- age and commission business, with offices in Cincinnati and in the city of New York, and that it carried on such business until June 5, 1912. That the part- nership agreement contained a provision that during the continuance of the partnership no one of the firm should engage in speculative contracts or pur- chases: That at the time when the partnership was formed, and ever since, the defendant has been a member of the New York Stock Exchange. That in the month of January, 1910, the defendant, Criss, in violation of his agree- ment, engaged in contracts of a speculative nature, which resulted in his sus- pension from the Stock Exchange because of obligations which neither he nor the firm could meet; the firm becoming insolvent, which led to the appoint- ment of a receiver over its assets. That because of the facts above stated the plaintiffs sustained large pecuniary losses, and a large part of the assets of the partnership were used in settlement of the losses resulting from these speculative contracts. That on June 5, 1912, the plaintiffs agreed with de- fendant, Criss, to release him from all their claims against him, the considera- tion being a new partnership agreement to be entered into between them, by which there should be secured to the plaintiffs for a period of four years all the benefits to be derived from a membership in the New York Stock Exchange through the use of defendant's seat therein; Criss having been restored to his membership in the Exchange. That the new partnership agreement was made and business was carried on under it until January 25, 1915. That shortly prior to that date the plaintiffs were advised by defendant that the partnership agreement of June 5, 1912, had been examined by the Stock Ex- change officials, who required it to be forthwith rescinded as in contraven- tion of its rules, under penalty of the suspension of defendant, Criss, from its membership. That thereupon, in order to prevent the suspension of defend- ant, Criss, as aforesaid, the partnership agreement of June 5, 1912, was dis- solved, and it was agreed that the dissolution should not constitute a release by the plaintiffs of any legal rights to which they were entitled as against Criss.

It is alleged that defendant has failed to perform his agreement to secure to plaintiffs the benefit of his membership in the Exchange, and that by reason of his failure the plaintiffs have been obliged to transact their business as non-members of the Exchange, and have been compelled to pay full commis- sions on all sales and purchases made for their customers, and that their good will has been impaired and their credit injured and a large amount of busi- ness has been diverted from them, to their damage in the sum of $100,000, and they bring suit for the recovery of that amount. At the close of the case de- 'fendant moved to dismiss the complaint, and the court granted the motion.

Hartwell Cabell, of New York City, for plaintiffs in error.

N. E. Harby, of New York City, for administratrix of defendant in error.

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). Before considering this case on the merits, there is a preliminary matter to

which reference must be made. A brief has been presented to the court which is entitled "Brief Submitted by Administratrix of Defendant in Error." It is signed by counsel, who describes himself as "Attorney for Administratrix of Defendant in Error." The brief contains this statement:

"The defendant died on January 25, 1919; this brief is submitted by his administratrix appointed in New Jersey."

[1] Counsel who presented this brief was heard upon the argument. There is, however, the question whether the action has abated, and whether there is a defendant before the court.

In Bell v. Bell, 181 U. S. 175, 21 Sup. Ct. 551, 45 L. Ed. 804, the defendant died after argument in the Supreme Court, but before the case was decided. The court affirmed the judgment nunc pro tunc as of the date when the case was argued. As a general rule the death of a party pending a writ of error furnishes no ground for the abatement of the suit. In Green v. Watkins, 6 Wheat. 260, 5 L. Ed. 256, decided in 1821, the court, speaking through Mr. Justice Story, said:

"There is a material distinction between the death of parties before judgment, and after judgment, and while a writ of error is depending. In the former case, all personal actions by the common law abate; and it required the aid of some statute, like that of the thirty-first section of the Judiciary Act of 1789, c. 20, to enable the action to be prosecuted by or against the personal representative of the deceased, when the cause of action survived. * * * But in cases of writs of error upon judgments already rendered a different rule prevails. In personal actions, if the plaintiff in error dies before assignment of error, it is said that by the course of proceedings at common law the writ abates; but, if after assignment of errors, it is otherwise. In this latter case, the defendant may join in error, and proceed to get the judgment affirmed, if not erroneous; and he may then revive it against the representatives of the plaintiff. * * * "

[2] Rule 19 of this court (150 Fed. xxx, 79 C. C. A. xxx) provides that whenever, pending a writ of error or appeal in this court, either party shall die, the proper representatives of such deceased party may voluntarily come in and be admitted parties to the suit, and thereupon the case shall be heard and determined as in other cases. In this case that course was not pursued, and the executrix has not been admitted as a party to the suit. But rule 19 also provides that, if the representatives of the deceased do not become parties to the action, the other party may suggest the death on the record, and on motion obtain an order that, unless they do become parties to the action within 60 days, the party moving for the order, if plaintiff in error, shall be entitled to open the record and on hearing have the judgment reversed, if it be erroneous. The executrix of the defendant, Criss, not having asked to be made a party, the plaintiff in error gave her notice that he would move for an order requiring her to become a party within 60 days, and that, if she did not, he would be entitled to a hearing and have the judgment reversed, if it should be found to be erroneous. This court granted the order on November 18, 1919, over the objection of the executrix, who appeared specially and denied the jurisdiction of the court to make the order "or continue the cause against me as executrix of my said husband or otherwise." But, as the executrix never complied with the privilege accorded to her to become a party within the

specified period, or for that matter at any time since, she is not now and never has been a party to the action, and her counsel was without right to file a brief or to be heard on the argument, and she is without right to costs, if the court concludes that there is no reason why the judgment should be reversed.

[3] At the conclusion of the plaintiff's case the defendant's motion to dismiss on the merits was based on two grounds:

(1) Because it appeared that the plaintiffs and defendant knew at the time that the last copartnership agreement was made that it violated the rules of the New York Stock Exchange; that two parties have no rights, one against the other, if they depend upon a contract which at the time of its making is known to be in violation of some other contract which is obligatory.

(2) Because plaintiff testified that he refused to make the new contract with the defendant, which would have given the plaintiff the right to do business on the New York Stock Exchange, although defendant was ready, willing, and able to make the contract according to his agreement.

The court granted the motion and directed the jury to render a verdict for the defendant. "The case," said the court, "therefore, seems to come down to this: The plaintiffs, with knowledge that the defendant was a member of the New York Stock Exchange and bound by its rules—in other words, that he had a contractual relation with the Exchange to obey these rules—entered into a contract with the defendant in violation of these rules. This was a contract to commit a tort and can form no basis for recovery in his action."

The agreement of January 3, 1905, and that of June 5, 1912, provided for the formation of a "partnership" to carry on a general brokerage business in stocks, bonds, and other securities; but neither agreement in fact or in law created a partnership. Under the terms of these agreements there was to be no division of assets or profits. Criss was to carry on his business in New York as a member of the New York Stock Exchange, and was to retain all his profits arising therefrom. The plaintiffs were to carry on their business in Cincinnati, and were to retain all the profits arising therefrom. It was also provided that the death of any of the parties should not work a dissolution of the firm, and that the surviving "partners" should enjoy the benefits accruing from the membership of Criss upon the Exchange. The plaintiffs, as purported "partners" of Criss, carried on, as they admit, a large and profitable business with sundry members of the Stock Exchange, on all of which business they received a large per cent. of the regular commissions charged by said members of the Exchange, because they were apparently partners of a member of the Exchange. Under their agreement their business was to be conducted under the rules of the Exchange. Those rules provided (XXXIV, §§ 2 and 3) that a partnership might conduct its business on the Exchange under the terms provided for members, if one of the general partners had a membership in the Exchange, and if the interests of the partners in the main house and branch houses of the firm were identical. In this case they clearly were not identical in the sense intended. The rules also provided that the individual members of a firm not members of the Exchange were not to possess the privilege of having their individual transactions executed on the Exchange upon the terms applicable to members. No

person elected to membership could be admitted to the privileges of the Exchange until he had signed the constitution of the Exchange. That constitution was the contract between the members and by signing it the member pledged himself to abide by it. Article 17, § 6, provided that any member adjudged guilty of willful violation of the constitution, or of any resolution of the governing committee, should be subject to suspension or expulsion therefrom.

We agree that it is the right of the members of this Exchange to have the contract entered into by all of them duly observed by each of them. We agree that if A., who is not a member of the Stock Exchange, enters into an agreement with B., who is a member, for the conduct of business on the Exchange under its rules, and if that agreement involves a violation of the rules, the agreement so made is an attempt to violate the proprietary rights of the other members of the Exchange. These rights are property rights, and the attempt on the part of A., knowing the rules, to have B. violate his agreement with his associates, is a malicious attempt to have B. break a contract with the members and obtain for A. rights which violate the terms of the constitution by which the members of the Stock Exchange are governed.

The agreement of June 5, 1912, like the agreement of January 3, 1905, violated the rules of the Exchange. If the plaintiffs did not understand when they made it that the agreement of January 3, 1905, violated those rules, they became aware of the fact shortly after the agreement was made; for they were distinctly informed by Criss that the Exchange held that the agreement was in violation of the rules. Nevertheless the agreement of June 5, 1912, which was not substantially different in the matter now under consideration, continued the objectionable provision. So that shortly prior to January 25, 1915, the plaintiffs were advised by defendant, Criss, that the agreement of June 5, 1912, had been examined by the officials of the Stock Exchange and held by them to be in contravention of the rules of the Exchange, and that he had been ordered by its officers to abrogate the agreement forthwith under a penalty of a suspension from its membership; that thereafter, and on January 25, 1915, in order to prevent the suspension of defendant, Criss, from the Exchange, the "partnership" of June 5, 1912, was dissolved, it being agreed, however, that the dissolution should not release Criss from any liabilities he was under to the plaintiffs.

The cause of action is stated in paragraph 15 of the complaint. That paragraph is as follows:

"That the defendant, although at all times since the 25th day of January, 1915, a member in good standing of the New York Stock Exchange, and in the full exercise of all the privileges of such membership, has failed and refused, and still fails and refuses, to secure to plaintiffs the benefit of his membership in said Exchange in the transaction of their business, and that by reason of said failure and refusal plaintiffs have been obliged to transact their business as nonmembers of said Exchange, and without the benefits accruing to membership therein."

The agreement upon which the suit is based grew out of and is based upon the agreement of June 5, 1912. And in Armstrong v. Toler, 11

Wheat. 258, 6 L. Ed. 468, Chief Justice Marshall, speaking for the court, declared that the law was correctly stated which told a jury that:

"Where the contract grows immediately out of, and is connected with, an illegal or immoral act, a court of justice will not lend its aid to enforce it. And if the contract be in part only connected with the illegal transaction, and growing immediately out of it, though it be, in fact, a new contract, it is equally tainted by it."

It appears that the cause of action grows out of the failure of defendant to secure to the plaintiffs the benefit of defendant's membership in the Exchange, when to have done so would have caused him to break his contract with the Exchange. The question comes down to this: Can such a cause of action be sustained? There can be no doubt concerning the answer which must be given to such a question. We are satisfied that the agreement into which these parties entered violated the rules of the Exchange, and that all parties, the plaintiffs as well as the defendant, knew that fact when they entered into it. The court below was clearly right in saying that the plaintiffs with knowledge that "the defendant was a member of the New York Stock Exchange and bound by its rules—in other words, that he had a contractual relation with the Exchange to obey these rules—entered into a contract with the defendant in violation of these rules."

[4] The courts do not aid the parties to illegal agreements. If any principle of law is settled it is that a party to an illegal undertaking cannot come into a court either of law or equity and ask to have his illegal contract carried out. Ex dolo malo non oritur actio, and in pari delicto potior est conditio defendentis. It makes no difference whether the contract has been executed, or remains still excutory. The defense of illegality may be set up, not as a protection to defendant, but as a disability in the plaintiff. It was said by Lord Mansfield in Holman v. Johnson, 1 Cowper, 341, 343:

"No court will lend its aid to a man who founds his cause of action on an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff."

In Dent v. Ferguson, 132 U. S. 50, 66, 10 Sup. Ct. 13, 19 (33 L. Ed. 242), the Supreme Court, speaking through Mr. Justice Lamar, cited with approval Chancellor Walworth's opinion in Bolt v. Rogers, 3 Paige, 154, 157, in which he said:

"Wherever two or more persons are engaged in a fraudulent transaction to injure another, neither law nor equity will interfere to relieve either of those persons, as against the other, from the consequence of their own misconduct."

In Hocking Valley Ry. Co. v. Barbour, 190 App. Div. 341, 179 N. Y. Supp. 810, recently decided, the plaintiff had sold certain gondola cars to the Central Locomotive & Car Works. Prior to that sale the plaintiff had entered into a contract with one Wardwell for the sale of 300 of the said gondola cars. The two sales left about 50 cars belonging to the plaintiff unsold. The plaintiff, apparently being unwilling to hazard a liability to Wardwell by making the sale to the Central

Locomotive & Car Works, insisted that the latter should give a bond, executed by it and signed by defendant's testator, to save the plaintiff harmless from all damages and costs which might result if the plaintiff made the sale. The bond was given, the contract between the plaintiff and Wardwell was broken, and all the cars were delivered to the Central Locomotive & Car Works. An action was then brought by Wardwell against the plaintiff, and judgment was obtained for the breach of contract. Then suit was brought by plaintiff against the executors of the bondsmen upon his contract to save the plaintiff harmless from all damages arising from the failure to deliver the cars to Wardwell. The Supreme Court, Appellate Division, First Department, held the action could not be maintained, as the bond was unenforceable, having been executed as an inducement to the seller to break his contract with a third party. The bond was executed for an illegal purpose. In the course of its opinion the court said:

"Whatever right of action Wardwell may have had against the plaintiff, he had a primary right to have his contract consummated, and as this indemnity bond was given with full knowledge of all the parties of the fact that its purpose was to procure the plaintiff to deliberately violate his contract with Wardwell, the court will not give its aid. The law cares nothing for what a fraudulent party may lose, but will leave the parties where it finds them, and will leave them to disentangle themselves from the meshes in which they have become involved by their fraudulent agreement."

In Wald's Pollock on Contracts (3 Am. Ed.) 376, it is said:

"An agreement will generally be illegal, though the matter of it may not be an indictable offense, and though the information of it may not amount to the offense of conspiracy, if it contemplates any civil injury to third persons. Thus an agreement  *  *  *  to carry out some object in itself not unlawful  *  *  *  by means of  *  *  *  breach of contract or breach of trust is unlawful and void."

In 13 Corpus Juris, § 343, it is said that—

"An agreement is illegal and void where its object is the commission of a civil wrong against a third person, although the wrong may not be an indictable offense or crime, either at common law or under the statutes. This is true, for example,  *  *  *  of an agreement to perpetrate a fraud on a third person."

It is clear to us that the plaintiffs' cause of action grows out of an illegal and immoral contract. The immorality of the agreement to allow the plaintiffs the use of defendant's seat on the Stock Exchange contrary to the rules of the Exchange, and known to be so to all the parties, is so apparent that discussion is really unnecessary; and it is a well-established principle of sound public policy that no court will lend its aid to a plaintiff who grounds his action upon an immoral agreement. Therefore the court below was right in his direction to the jury to find a verdict for the defendant.

The fact that the illegality of the agreement was not pleaded is of no moment. In Oscanyan v. Winchester Repeating Arms, etc., Co., 103 U. S. 261, 26 L. Ed. 539, the court held that the illegality of the contract might be considered without being pleaded, saying:

"The position of the plaintiff that the illegality of the contract in suit cannot be noticed, because not affirmatively pleaded, does not strike us as having

much weight. We should hardly deem it worthy of serious consideration, had it not been earnestly pressed upon our attention by learned counsel. * * * It [the objection of illegality] was one which the court itself was bound to raise in the interest of the due administration of justice. The court will not listen to claims founded upon services rendered in violation of common decency, public morality, or the law. * * * It would not be restrained by defects of pleading, nor, indeed, could it be by the defendant's waiver, if we may suppose that in such a matter it would be offered."

Inasmuch as the cause of action grows out of an agreement which the court cannot recognize, it is unnecessary to consider any other question. The direction of a verdict, in favor of the defendant, was justified under the circumstances.

There being no defendant in this court, as heretofore stated, there can be no costs.

Judgment affirmed.