HARRY BUDD, Appellant, *v.* MORNING TELEGRAPH, INC.,
Respondent.

First Department, May 4, 1934.

*David Goldstein* of counsel [*Albert deRoode* with him on the brief; *Goldstein & Goldstein*, attorneys], for the appellant.

*Arthur H. Schwartz* of counsel [*Irving Moross* with him on the brief; *Nathan Burkan*, attorney], for the respondent.

GLENNON, J. This is an appeal from a judgment at Trial Term entered upon a dismissal of the complaint at the close of plaintiff's case. The action was instituted by the plaintiff to recover $7,650 for the breach by defendant of a contract of employment.

Plaintiff entered into a contract in writing with a corporation, known as Daily Racing Form Publishing Company, on February 16, 1928. The contract was to run for three years. Under its terms plaintiff was to receive $200 per week for the period commencing March 1, 1928, and ending February 28, 1929, and a

salary of $225 per week for the period of two years commencing March 1, 1929, and terminating February 28, 1931.

Plaintiff was what is known as a handicapper of race horses. It was part of his duty to make selections of probable winners of races at different tracks. He received a list of the entries twenty-four hours in advance, the distance of the races, the weights the horses were to carry, post positions and probable jockeys. Based upon these facts, together with a knowledge of the breeding of the various horses, their owners and trainers, he would forecast an opinion as to the manner in which the horses would finish.

After the contract was entered into, plaintiff was directed by the Daily Racing Form publication to take up his duties in California, although it was executed in New York. The contract was silent as to the place of performance. Much against his will, however, he complied with the directions of his employers. He was very much dissatisfied with the arrangement, since his family resided here, and he felt that, inasmuch as he was kept off " the streets of the East," his " name would just sort of evaporate."

On April 27, 1929, an article was published by the defendant corporation wherein reference was made to the fact that patrons of the turf were asking " the whereabouts of Harry Budd, prominent selector and handicapper for various racing publications." Shortly thereafter one Ralph Kahn, a friend of the plaintiff, communicated with the defendant, informing it of the fact that plaintiff was on the coast. On May thirty-first, Henry Schneider, turf editor of the defendant, telegraphed Kahn at San Francisco, requesting him to phone to him at defendant's New York number. As a result thereof, the plaintiff communicated with Mr. Schneider. Schneider asked him if he was open to negotiate with the *Morning Telegraph*. Budd said that he had a contract with *Racing Form*. A Mr. Jeans, the general manager of the defendant, " got on the phone " and informed Budd that " We will assume all responsibilities for any contract." Pursuant to request, a copy of the *Racing Form* contract was forwarded to the defendant. On June fourth the following " extra rush " telegram was concededly sent to Kahn:

" Ralph Kahn, 225 Hyde St.

" Nathan Burkan advises Budd contract not binding stop Telegraph will assume remainder of contract at same terms and legal expense if any stop Advise when Budd can report here.

" PAUL G. JEANS,
" *General Manager*."

After the receipt of that message, on June fifth, pursuant to another telegram, the plaintiff talked on the telephone first to Mr. Schneider and then to Mr. Jeans. He was informed by the latter,

" You have nothing to fear or nothing to worry about. The *Telegraph* will protect you in every which shape, manner and form." Plaintiff said that he would like to have transportation money before he would come on. The reply was, " We are wiring you $300 immediately." The money was received and plaintiff came to New York.

In company with Mrs. Budd and Mr. Kahn, he visited the office of the *Morning Telegraph* and there met Mr. Schneider, Mr. Jeans and Mr. Moore, the owner and president of the company. It was suggested by Budd after he agreed to enter the employ of the defendant that the contract between him and the defendant should be reduced to writing. At Mr. Moore's direction, Mr. Jeans accompanied the plaintiff, his wife and friend to Mr. Burkan's office. The latter on being informed of the purpose of the visit said, referring specifically to the telegram set forth at length herein, " This is your contract right here  *  *  *. There is nothing else necessary. There is absolutely nothing to worry about." A letter was prepared by Mr. Burkan, and signed by the plaintiff, addressed to the *Daily Racing Form*, wherein Budd informed the latter in substance that he had made up his mind to accept other employment on account of his " unhappiness and dissatisfaction" due to the treatment he received from *Racing Form.*

Plaintiff entered the employ of the defendant company and carried out his contract for a period of about thirteen months. At the end of that time one Mr. M. L. Annenberg became the president of the defendant corporation in place of Mr. Moore. He was president of the Daily Racing Form Publishing Company at the time plaintiff entered into the contract with it in February, 1928, and also acted in that capacity when the notice on plaintiff's part that he did not intend to carry out the contract was received by it in June, 1929.

On or about July 5, 1930, Mr. Jeans, the defendant's manager, informed plaintiff that Mr. Annenberg had purchased the *Morning Telegraph* and, as a consequence, that his services were no longer required. A check in the sum of $675 was tendered to plaintiff, which covered the amount of salary due for one week and two additional weeks in advance. Plaintiff refused to accept it since he noted that it had a statement on it " pay in full." Subsequently he obtained a check in the sum of $225 which was the amount actually due on that day. His contention was that he was ready, willing and able to perform the contract. The complaint was dismissed on the theory that the contract in suit " was based on fraud in that it is based upon the inducement of the breach of another contract."

We believe that the plaintiff proved facts sufficient to establish at least a *prima facie* cause of action. Plaintiff had a legal right to repudiate his contract with the Daily Racing Form publication. The latter, it is true, might have had a cause of action against plaintiff. It might well be, in view of the circumstances out of which the dissatisfaction of Budd grew, that he would have been permitted to explain that it was not within the contemplation of the parties at the time the contract was entered into, to have plaintiff render his services at a place distant some 3,000 miles from his home and defendant's main place of business. That may have been the reason why this defendant corporation informed plaintiff, on the advice of counsel, that the contract was not binding upon him. In any event he would have the right to present his version of the facts in a suit based upon a breach of the *Racing Form* contract to a court, in order to have determined the question as to whether or not he would be held answerable in damages. He could, if he saw fit, have held himself in readiness to pay to the Racing Form Publishing Company any amount as damages which might be assessed against him, if it were found that he had no justification for breaking his contract. The fact remains that, while the original contract had a provision in it which might have entitled the *Daily Racing Form* to an injunction restraining Budd from the performance of his contract with the defendant, nevertheless, no action was instituted against him by his former employer either in equity or at law. We cannot say on this record that the plaintiff and this defendant were *in pari delicto* in so far as the *Racing Form* contract was concerned. The defendant corporation may have been guilty of a wrong for inducing plaintiff to repudiate his agreement. However, it does not follow therefrom that this plaintiff was guilty of any wrongful or fraudulent conduct on his part.

It is unnecessary to review at length the four excellent opinions which were written in *Reiner* v. *North American Newspaper Alliance* (259 N. Y. 250). The respondent relies on that case as an authority to sustain this judgment. We do not read it that way. In that case Reiner, unquestionably, was guilty of misconduct in violating the terms of his contract of passage, which were imposed as a condition precedent to his right to take a trip on the *Graf Zeppelin*. He promised that he would give no interviews and send no reports of the passage while *en route* and for eight days after the completion of the flight. With that arrangement in mind he contracted with the defendant to furnish it with information while *en route* in violation of his contract with the owners of the *Graf*. The reasons why he was not permitted to succeed are concisely summed up by

Judge CRANE (at p. 259) as follows: " The *Graf Zeppelin* was about to make a record flight from Germany to America and the events happening from start to finish would be of extreme interest to the news reading public. To obtain this news it was necessary to travel in the ship. While in transit the news was a secret, known only to those making the flight. The owners of the ship, therefore, had the right to keep this news to themselves the same as they had the right to possess any other property, at least, until the landing of the ship. Those in authority could impose as a condition for taking passage the promise and agreement not to reveal, by radio or otherwise, these secrets, these matters of news interest. The plaintiff obtained permission to go aboard the ship and to fly across the Atlantic upon his promise and agreement that he would not give out any accounts of the journey or the happenings on the passage. He was trusted; he was believed; he obtained the confidence and the secrets of the *Graf Zeppelin* people. And this he did, it is alleged, for the very purpose of betraying that confidence, defrauding the owners and violating his trust. He now comes into court and asks the judiciary of this State to help him recover money from the defendant for his fraudulent and deceitful conduct. The defendant, he says, promised to pay him for his betrayal."

In the case now under consideration, however, we have on the part of plaintiff a mere repudiation of contract, something which he could not have contemplated at the time he entered into the agreement with *Racing Form* in February, 1928. He did no " wrong " in breaching it. If wrong there was, it was solely on the part of the defendant corporation, which is attempting to take advantage of it.

For the reasons assigned herein, we believe the judgment should be reversed and a new trial ordered, with costs to the appellant to abide the event.

FINCH, P. J., and TOWNLEY, J., concur; MERRELL and UNTERMYER, JJ., dissent and vote for affirmance.

UNTERMYER, J. (dissenting). The facts to which the plaintiff testified plainly reveal a situation in which the plaintiff entered into a contract with the defendant which required him ruthlessly to violate his existing contract of employment with the *Racing Form*. I find no evidence to sustain the claim that Budd was justified in disregarding that contract because he had been assigned to work in California. His contract with the *Racing Form* does not specify where he shall render services. When instructed to assume his duties in California he seems to have complied some-

what reluctantly, but he did comply. If those instructions were not in accordance with his contract of employment, it was his right to refuse then to work in California. He could not, however, comply with the instructions and then make use of that compliance as an excuse for terminating the employment. (*Imperator Realty Co.* v. *Tull*, 228 N. Y. 447.) Indeed, it is entirely clear that this contention is an afterthought. Budd testified that in the telephone conversation with Mr. Schneider he told him that " I am employed here now, *and have a contract with the Racing Form.* * * * It is a three-year contract, which *has about two years to go.*" Referring to the same conversation, he also testified: " Well, to Mr. Schneider I says that ' Everything is satisfactory so far, and I would like to go further into this thing in regard to *in case the Racing Form wants to take any action against me, will I be protected?* ' He says, ' Just a minute, Mr. Jeans will talk to you.' And I went on with the same story with Mr. Jeans, and he said, ' absolutely guarantee everything. You have nothing to fear or nothing to worry about. *The Telegraph will protect you in every which shape, manner and form.*' " From the inclusion in their contract of the provision that the defendant would indemnify Budd against the consequences of his act, it is obvious that both parties recognized the validity of Budd's contract with the *Racing Form*. It was upon this covenant of indemnity that Budd relied. He testified that he was " not interested," that Mr. Burkan had advised that his contract with the *Racing Form* was not binding. What interested him was " that the *Telegraph* will assume remainder of contract at the same terms, *and legal expenses, if any* " and, as he said, in " the *Telegraph* assuming the responsibilities."

The contention cannot be made that the *Racing Form* indicated by word or act that it acquiesced in this deliberate violation of its rights, even if that were material here. When informed that Budd had concluded to accept other employment, it did not allow its position to remain in any doubt. It promptly wrote urging Budd to report for duty, saying: " Under date of February 16, 1928, you entered into a contract with this corporation, whereby you agreed to work for us until February 28, 1931. Please take notice that we propose to insist on our rights under the above contract. We hereby demand that you immediately report for duty at our New York office and render services pursuant to said contract."

The question then which is directly presented by this appeal is whether a contract, the performance of which to the knowledge of both contracting parties necessarily involves the breach of an earlier contract with another party, is against public policy and unenforcible. I agree with Mr. Justice GLENNON that this

question was not decided in *Reiner* v. *North American Newspaper Alliance* (259 N. Y. 250), nor am I able to find that it has ever been decided by the Court of Appeals. It has, however, been directly held by this court and by several other courts that such a contract is not enforcible, because resulting in the infliction of a civil wrong upon another. This is not a case where an employee, after breaking a contract of employment, has secured employment or entered into a contract of employment elsewhere. The contract which is to be enforced here is the very instrument of wrong. The effect of allowing it to be enforced is to encourage these delinquencies by assisting a plaintiff in such a situation to secure the proceeds of his breach of faith. In accomplishing this undesirable result, it also constrains a defendant to continue in the commission of a tort (*Hornstein* v. *Podwitz*, 254 N. Y. 443; *Lamb* v. *Cheney & Son*, 227 id. 418; *Campbell* v. *Gates*, 236 id. 457) by awarding damages against him if he does not perform. Moreover, if valid now, the contract is equally valid and enforcible before the employee has severed relations with his previous employer. It follows that in such cases damages will be recoverable against whichever party, even then, refuses to proceed with the performance of a contract which both are under a legal duty to repudiate.

Public policy forbids the interposition of courts to lend their aid to purposes like these. We should leave the parties to this contract as we find them, in order to repress such acts by competitors and employees alike. They will be more likely to refrain from such transactions if they know that their contract will not be enforced. The defense of illegality is allowed " not as a protection to a defendant, but as a disability to the plaintiff." (*Reiner* v. *North American Newspaper Alliance, supra.*) (See, also, the many authorities cited in the *Reiner* case.) The rights of the parties here do not depend on any calculation of their relative iniquity, for both were equally at fault. The plaintiff's contract required him to render services to the *Racing Form* and to no one else. The defendant's duty required it to abstain from interference with that contractual relation. In measuring the degree of culpability, it seems to me without significance that the defendant made the offer, and that the plaintiff only accepted the offer, which resulted in this contract. Both joined in the commission of the final act which deprived the rightful employer of the plaintiff's services.

Our attention is directed to no decision, and none is cited in the prevailing opinion in this case, which has sustained a cause of action of this character. On the contrary, in *Hocking Valley R. Co.* v. *Barbour* (190 App. Div. 341) this court refused the enforcement of a contract having such a tendency, and in *Attridge* v. *Pembroke*

(235 App. Div. 101) the Appellate Division of the Fourth Department in a well-reasoned opinion followed the same principle. In *Roberts* v. *Criss* (266 Fed. 296) the Circuit Court of Appeals for the Second Circuit refused enforcement of a contract which necessarily involved the breach of a contract by one of the parties and a third. Two other jurisdictions have adhered to this rule (*Rhoades* v. *Malta Vita Pure Food Co.*, 149 Mich. 235; *Wanderers Hockey Club* v. *Johnson*, [Brit. Col.] 25 West. L. Rep. 434). It is significant that the three cases last referred to are cited with approval in the *Reiner Case* (p. 256). Professor Williston expresses a similar view (3 Williston Cont. § 1738) as does also Wald's Pollock on Contracts ([3d Am. ed.] 376). Indeed the tendency in this direction is the subject of comment in 83 American Law Reports, 32, where the decisions are collated and reviewed. Perhaps the growing recognition of the principle is due to the increased importance of contracts of all kinds in modern life and the necessity, at times, of protecting them against premeditated violation by something more than an award of damages, which, we know, are often not collectible. (See Barbour's, The "Right" to Break a Contract, 16 Mich. L. Rev. 106.) Finally, as strongly indicative of what I think is the prevailing view, section 576 of the American Law Institute's Restatement of the Law of Contracts provides that "A bargain, the making or performance of which involves breach of a contract with a third person, is illegal."

[In consonance with decisions in this and other courts, with the opinions of leading commentators and with the salutary public policy to be served, I think we should hold this contract to be unenforcible. For these reasons I favor affirmance of the judgment.

MERRELL, J., concurs.

Judgment reversed and a new trial ordered, with costs to the appellant to abide the event.